### JOHN COCKERELL V. THE STATE.

#### No. 369.  Decided February 17.

1. **Continuance — New Trial.** — Where the overruling of an application for continuance is one of the grounds urged for a new trial, and it appears from the evidence adduced on the trial that the proposed absent witness was not at the place stated in the application for continuance, and that if he should testify as set forth in said application, his testimony would not probably be true, *held*, the continuance was properly refused, and motion for new trial based thereon properly overruled.

2. **Murder — Evidence — Insulting Language Concerning a Female Relative.** — On a trial for murder, where defendant offered to prove that several years before the homicide, and before defendant's marriage, deceased had remarked to a third party that he believed he could have, and intended to try to have, carnal intercourse with the woman defendant afterwards married: *Held*, the evidence was too remote, and besides it appeared never to have been communicated to defendant prior to the homicide. Following Ex Parte Jones, 31 Texas Criminal Reports, 422.

3. **Same — Statements of Defendant — Res Gestæ.** — On a trial for murder, where defendant offered to prove the statement he had made to his mother, after he had ridden seven miles from the scene of the killing, and it did not appear what interval of time had elapsed, *held*, the evidence was not brought within the rule of res gestæ, and was properly rejected.

4. **Charge — Reasonable Doubt Between Degrees.** — On a trial for murder, where the charge of the court instructed as to the reasonable doubt between the different degrees of homicide, and further instructed generally as to a reasonable doubt of guilt upon the whole case, *held*, the charge upon this subject was amply sufficient.

5. **Same.** — On a trial for murder, where the jury were instructed as to the testimony, that " you should reconcile all conflicts in the testimony if you can; but if you can not, you must decide which of the testimony is entitled to the greater credibility and weight; and in so determining you may consider the intelligence, interest, apparent bias or prejudice, if any, of the witnesses, as well as their manner of testifying;" and it was objected that said charge called attention directly to the testimony of the defendant and his wife, the witnesses most interested: *Held*, the objection was not tenable, and the charge was not erroneous. Following Adams' case, 20 Southwestern Reporter, 548; and Brown v. The State, 2 Texas Criminal Appeals, 115.

6. **New Trial — Prejudiced Juror.** — On a motion for new trial, where the ground was that a juror had expressed an opinion as to the guilt of defendant, but the party making affidavit to that effect in a subsequent affidavit expressly stated otherwise, and the juror himself expressly denied the statement, and averred that he had neither formed an opinion nor known anything of the facts prior to the trial, *held*, that the overruling of the motion was correct.

7. **Verdict.** — Where, in writing the word " twenty" in a verdict, the letter " w" might be mistaken for the letter " m," *held*, the verdict will not be disturbed where the intention of the jury is too plain and patent for discussion.

APPEAL from the District Court of Stephens.    Tried below before Hon. T. H. CONNER.

Appellant was indicted for the murder of W. M. Norton, and upon his

trial was convicted of murder of the second degree, the punishment being assessed at a term of twenty-five years imprisonment in the penitentiary.

As soon as indicted and arrested, to-wit, December 1, defendant filed proper application for process to Ellis and Wise counties for the witness G. C. Black. When called for trial, he moved for a continuance in order to obtain the testimony of said Black, for whom attachments had been duly and legally issued and promptly forwarded to Wise and Ellis counties, and by which witness defendant would prove that the witness was near the eastern abutment of the bridge over Gonsolus Creek and about 100 yards from the scene of the killing at the time it occurred, and saw the deceased advance on his horse toward defendant, and strike at him with what appeared to the witness to be a knife; that prior to that time defendant had made no hostile demonstrations whatever toward deceased.

· It appears that W. M. Norton, the deceased, and the defendant had had a difficulty several years prior to the killing, when the defendant was but a boy, and that Norton had beaten and maltreated him; but that they had made up the difficulty and apparently become friends. Defendant had worked for Norton, and Norton was indebted to him in the sum of $64. Norton proposed to turn over a wagon, which he left with one Backus, in payment of the $64, but defendant refused to take the wagon. Norton lived in the suburbs of the town of Breckenridge, and was killed near his home, on the 9th of May, 1893, between 3 and 4 o'clock p. m. On the morning of that day defendant was in the town of Breckenridge, and inquired for gun cartridges at several of the stores. He also visited a lawyer's office, and asked his advice about instituting suit against Norton. Defendant appeared at Norton's house about 3 o'clock and inquired of Mrs. Norton for her husband. She told him he was out horse hunting, but expected him to return in a short time.

Dan Stuart testified: The day that deceased was killed, Eli Ward, deceased, and I went to hunt some horses. While hunting them we killed a squirrel; we did not use any weapon in killing it, because we had none. We returned to Ward & Black's pen with about nine horses in the bunch. On our way back I do not recollect meeting any one except the defendant. We met him opposite Ward's gin, near town, on the east side of Gonsolus Creek, on the Graham road, at a point about 200 yards from the bridge. When we met defendant, we stopped. I heard defendant ask if any one wanted to fight. I do not remember all he said to deceased, but heard defendant say that he had come by deceased's house to see him. Deceased asked him to go with us to the horse pen. He said he was in a hurry to get home; he did not have time. They were then facing each other, about three or four feet apart. Eli Ward and I then went on after the horses. The horses were going pretty fast. When we got to where the road turns east, about 250 or 300 yards from de-

ceased and defendant, I looked back, and saw them in the same position they were when we left them.

We drove the horses between a quarter and a half-mile from where we left them, to pen them. Ward got off his horse and opened the gate. The horses were going in a lope when we turned east in lane opposite Mc-Fall's field. Just as we shut the gate I heard five shots, and could locate them. We mounted our horses and returned as fast as our horses could carry us. When we got near to where the road turns south I saw W. E. Turrentine and McFall coming out of the McFall field; did not notice George Turrentine. I saw deceased's horse crossing the creek, and I saw the body of deceased lying in the road, about where we had left him and defendant. I saw no one else. I could see plainly beyond deceased in the direction of the bridge, and saw no one. As we went on to pen the horses I saw the two Turrentines and George McFall. They were to our left, over in the McFall field, about fifty yards from the fence along the road, south and about midway between a ravine that ran down through the field and a wire fence they seemed to be building there, about thirty or fifty yards west of where I saw them. They were walking towards this fence. If they had continued walking in the same direction, they would have gone to a point on said fence about fifty yards from the corner. All of this was in Stephens County, Texas.

Cross-examined: I don't know how the difficulty began, nor anything about it. I don't know if any one was at or near the bridge during the difficulty. I did not see the defendant and deceased during any part of the difficulty. There were two beaten tracks in the road near where the deceased's body lay. The body was in the most westerly of the tracks; I think nearer the creek than the fence on east side of the road, or near the middle of the road. When defendant met us, he turned to his right. It was about 260 yards from where deceased's body lay to the south fence of the McFall field, and 75 still further to where I saw the Turrentines and George McFall in this field. I think it was about from three to five minutes from the time we left deceased and defendant till we heard the shots. I did not see defendant on my return.

Eli Ward's testimony was substantially the same as Dan Stuart's.

George Turrentine, testified: On the 9th of May, 1893, in Stephens County, Texas, Dick McFall, my father, W. E. Turrentine, and I started from McFall's house to where we were stretching some wire on a fence near the road, and about 75 or 100 yards west of a ravine that ran through the field. When we had gotten to our work, I noticed two men on horseback in the Graham road, south from us about 250 or 300 yards. We started to go to work, and I soon heard a shot. I looked up then and saw one of these men falling from his horse. The other man was off his horse, some ten or fifteen feet off, and I saw him run around his horse and commenced shooting the man that fell from his horse. The man fell flat

on the ground, and seemed like he was trying to raise his head and shoulders up. He seemed like he could not use his legs. I heard him say, just after the first shot, "*John, for God's sake don't shoot me; for God's sake don't shoot me any more, I will take it back; I will take it back. Don't, don't shoot me any more.*" When the shot next to the last two was fired the head of the man on the ground sank down, and he ceased to cry out. Then the man on the ground went up close to the head of deceased, held whatever he had in his hands in both hands, and fired two shots. The man doing the shooting then ran a little east towards the wire fence on east side of the Graham road, like he wanted to get over; then he ran toward the crossing, caught and mounted his horse, and then ran by deceased on south and up the road.

I saw no one in this road except deceased and defendant; and when defendant was running off, I saw him plainly, and could see no man either on foot or on horseback. I could see plainly down this road, in the direction taken by defendant, all the way to the bridge. When I heard the first shot, Dick McFall was working a little west and nearer the west fence than I was. I saw plainly down the road to and beyond the place where deceased was shot. There was no obstruction. When I heard the first shot, we all three, W. E. Turrentine, McFall, and I, went on a run towards the shooting. I think Eli Ward got there first, and I think I was the second one there. When we arrived, deceased's clothes were on fire, and Eli Ward went to the creek, brought water, and put the fire out. The man doing the shooting rode a horse I took to be dark colored. When we arrived where deceased was in the road, he was lying sorter on his belly, with face downward, his arms sorter drawn up; one was a little more out than the other.

Cross-examined: I was not summoned on the habeas corpus trial. The body of deceased was lying between the two tracks in the road; his head was on the west side of the east track, and his feet were between the two. I don't know how far these two tracks were apart. This road runs south until it joins the Palo Pinto road, then the Palo Pinto road runs east. When I heard the first shot I was not then noticing deceased or the defendant, but looked up and saw them immediately on hearing the shot. I suppose I was fifteen or twenty steps east of the fence we were working on when I heard this shot, and ten or fifteen steps south of this large black post. There were no brush or trees to interfere with our plain view to where the shooting occurred, and down the road to where it joins the Palo Pinto road.

Redirect: At the time of the shooting I did not know either of the parties. When I last saw the man doing the shooting, he was down the road, about 200 yards from the body, near the bridge, and running his horse, and I could see him plainly until he turned east from the bridge on the Palo Pinto road. Will not say that no one was at bridge at and dur-

ing the shooting, but I saw no one there either before or after or during the time. Saw deceased's body just as it fell to the ground. At the first shot I looked up and saw deceased's horse plunge forward and Norton fell to the ground. I am not related to any of the parties, nor interested in this case.

This witness was fully corroborated by W. E. Turrentine and McFall and others, and it is unnecessary to reproduce their testimony.

Mrs. Cockerell, wife of defendant, testified: I am the wife of the defendant, John Cockerell. I knew the deceased ever since I can recollect. I have been married about three years. About one year before the killing Norton came to our house to hire my husband to drive stock for him. My husband told him he would have to get up a horse to ride. Deceased was on horseback when he came to our house on this occasion, and he let my husband have his horse to hunt up a horse to ride. Norton remained in our house while my husband was out looking for a horse to ride. There was no one at our house after my husband left but myself and deceased, Norton. After my husband had been gone a little while, he commenced talking to me and telling me how he used to love me, and how pretty he thought I was when I was a girl; and after a while he came around where I was sweeping the room and put his arms around my neck. I was very indignant, and told him to take his old arms away. He then asked me what I meant. I told him that I meant for him to keep his hands off of me. He then went out of the house, and after a little while returned. He then asked me not to say anything to my husband about what had occurred. I told him that I would tell my husband. He said that if I did it would not be good for him. I did not say anything to my husband about this matter at that time, as I feared it would lead to trouble. About one month before the killing, and after my child was born, deceased again came to our house when my husband was absent, and after remaining awhile got up and came towards me, and told me he wanted to kiss me before he went.

Cross-examined: I am now 19; married at 16. Norton's first visit, above referred to, was in the spring, in April, of last year, in the morning, at 8 or 9 o'clock. Norton did not talk anything except about how pretty I was and how he used to love me; then came around to where I was sweeping the floor and put his arms around my neck, and it was then that I told him to take his old hands off of me. Norton then went out and came back into the house, and asked me not to tell my husband anything about it. I said I would. Babe Norton came to my house in the month of April, I think it was, about a month before the killing. Can't say definitely as to the time, but think it was a month before the killing; one morning in April, 1893. Norton was riding a gray horse. My husband was not at home when he came. He was out riding; I suppose horse hunting. I don't now remember the day of the week, but am sure it

was in the morning of the day he came. I asked him in the house when he came, and he asked me where Johnny, my husband, was. After I invited him in, and he had taken a seat, I talked pleasantly with him for awhile, and in a short time he got up, as though he was going to leave, and approached me and asked me to let him kiss me. I told him I would not; that I would knock him down; and he said he would slap me over. He then turned and went out, and shortly came back and told me not to tell Johnny anything about what he had said to me, and I told him I would tell Johnny; and he said if I did, it would not be good for Johnny. I never told my husband of Norton's conduct until the morning before the killing. My husband was fretted about some word Norton (deceased) had sent him concerning a wagon trade which was then pending between them, he and Norton, and was talking to me about it, and I then told him that if I was in his place that I would not allow Babe Norton (meaning W. M. Norton) to run over him any longer; and at this juncture I told him that Norton had been mistreating me, and that he had insulted me on two different occasions; once about a year before then, by putting his arms around my neck at our house, while he was absent, and again about a month before, at our house, by asking me to let him kiss me, and threatening to slap me over when I refused to allow him to kiss me. We were eating dinner when I told him. After dinner my husband went to his uncle's (Tom Williams), and I went over to Mrs. Sandy's. I was at Mrs. Sandy's at the time the killing occurred, having gone over there on Monday evening, where I remained until, I think, Wednesday morning.

John Cockerell, defendant, testified: I am the defendant in this case. My age is 24 years. I am married to Jennie Bishop. Have been married three years. I have known deceased, Babe Norton, a number of years; ever since he came to the county. I was in town on the day of the killing. Stayed at my uncle's, Tom Williams, about eight miles east of the town of Breckenridge, on Monday night before the killing on the following Tuesday afternoon. My uncle had borrowed my pistol, and when I started to town on Tuesday morning from my uncle's, he informed me that he was through with the pistol, and asked me to take it home; and he got the pistol and handed it to me. It was a 44-calibre pistol, and had six loads in it when my uncle handed it to me. I came to town on that morning. Came alone; don't know exactly what time I arrived at town. Made numerous purchases in town that day. I bought a broom, some bridles, two horse collars, a couple of pads. Made inquiry of several parties on that day concerning the whereabouts of Babe Norton. Went to several places in town and endeavored to purchase cartridges for a target gun I had at home, which I used in squirrel hunting. I left town early in the afternoon, horseback, having in my possession the broom and the other articles purchased by me, and went by the house of deceased, Norton, in the eastern portion of the town, near the lower

crossing on the Gonsolus, and inquired of Norton's wife as to where he was. She told me he had gone over on Cedar after some stock horses, and I went on in that direction on my way home; crossing the creek at lower crossing, and about midway between the bridge, and the lower crossing on the Gonsolus creek, on the Graham road, I met Norton, Dan Stuart, and Eli Ward, driving some horses. When I saw them, I turned and rode near the bank of the creek on the right, in order to let the horses pass, and then rode on up and spoke to the boys, and said, "Do any of you boys want to fight?" I often make use of this expression in a joking way, as I did then. Babe (meaning Norton) or one of the boys then said, "Come and go back to the pen with us." I said, "I want to see Babe."

Stuart and Ward then said that they could pen the horses, and went on with the horses in the direction of the pen, and Babe remained, and I waited until they had got off, so they could not hear, as I did not want any one to hear our talk. I then asked Babe what he meant by the word he sent me about the wagon, and he said, "By God, I meant business;" and I then said, "There is another thing I want to know, and that is, what you meant by talking and doing to my wife as you did?" He said, "Good God, did she tell you that?" and I said, "Yes, she did." He said, by God he meant business, and he was going to do it again, and then said, "And by God, I am going to cut your guts out," and jumped down off his horse and run his hand down in his pocket. I thought he had a pistol, and I jumped off my horse on the opposite side of my horse. He pulled out and opened his knife and started towards me, and I pulled my pistol as quick as I could and shot as rapidly as I could. He then fell, and I stopped shooting, thinking that I had disabled him, when he placed his hand back towards his hip pocket, and I fired two more shots just as quick as I could. I fired no more after these two shots were fired. My first shot was over the hips of my horse. Norton was then on one side of my horse like, and I on the other, some three or four feet away.

Cross-examined: Think first shot was in breast; it did not knock him down; second shot in stomach, third in hips. He never fell to the ground until the third shot. He first fell sorter on his hands like, then raised up in rather a sitting position, and ran his hand back to his hip pocket, and I thought was trying to get a pistol. He asked me not to shoot him at this juncture, but I thought he was trying to get a pistol. Am certain we were both on the ground before I fired the first shot. He did not fall until the third shot. I hit him once in the head, I know. Don't know if the other hit him.

A number of witnesses testified to the good character of defendant as a peaceable, law abiding man.

*Wm. Veale & Son, W. P. Sebastian, B. D. Shropshire,* and *Ed J. Hamner,* for appellant.

*S. W. T. Lanham* and *R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at twenty-five years in the penitentiary.

1. The application for continuance was properly overruled, as was the motion for new trial based upon the refusal of the continuance. The evidence adduced upon the trial shows the absent witness was not at the point designated in said application, and had he testified as set forth therein, his testimony would not have been probably true. Every eye-witness to the transaction shows that the deceased was not advancing upon defendant, and that he had no knife in his hand at the time he was shot. The parties reaching the body immediately after the shooting found deceased's knife in his pocket, and closed. Inasmuch as he was shot through the heart or near it, and twice through the brain, it was impossible that he could have closed the knife and returned it to his pocket after being shot.

2. Defendant offered to prove by Goodwin that in 1887 deceased remarked, that he believed he could have carnal intercourse with Jennie Bishop, and that upon the first opportunity he intended to try and have such intercourse. This was some years before she married the defendant; and besides, the imputed statement was never communicated to defendant, and was too remote to have any bearing on the case. The court did not err in refusing this evidence. Ex Parte Jones, 31 Texas Cr. Rep., 422.

3. He further offered to prove by his mother the statement of himself made to her, to the effect that he killed deceased to save his own life. Defendant had ridden seven and one-half miles from the scene of the homicide before making the statement. He was pursued by the sheriff and posse; he avoided them by deflecting from the road and hiding till they passed; and the court states the evidence fails to show how long thereafter it was before he saw his mother and made the statement sought to be introduced. The court was clearly right in rejecting the proffered evidence. It was not brought within the rule of res gestæ, and there was enough evidence of deliberation on his part.

4. Exception was reserved to the charge, because it failed to charge the "reasonable doubt" between manslaughter and self-defense. The court gave this charge as between murder in the first and second degrees, also between murder in the second degree and manslaughter, and further instructed if there was a reasonable doubt of defendant's guilt, he should be acquitted. This was sufficient.

Even had the court failed to instruct the jury to apply the reasonable doubt between the degrees of culpable homicide charged upon, such omis-

sion would not have been error where the court applies such doubt to the whole case. Hall v. The State, 28 Texas Cr. App., 146; McCall v. The State, 14 Texas Cr. App., 353; Powell v. The State, 28 Texas Cr. App., 393; Ashlock v. The State, 16 Texas Cr. App., 13; Bennengfield v. The Commonwealth, 22 S. W. Rep., 1020. After informing the jury that they were the exclusive judges of the credibility of the witnesses and the weight to be given to the testimony, the court further said: "You should reconcile all conflicts in the testimony if you can; but if you can not, you must decide which of the testimony is entitled to the greater credibility and weight; and in so determining you may consider the intelligence, interest, apparent bias or prejudice, if any, of witnesses, as well as their manner of testifying."

This charge was objected to, because "it was directly calling the attention of the jury to the testimony of defendant and his wife, who were the parties most interested among the witnesses who testified." The very charge here complained of was held not to be erroneous in Adams' case, 20 Southwestern Reporter, 548; Brown v. The State, 2 Texas Criminal Appeals, 115.

A ground of the motion for new trial was based upon the fact that one of the jury, Hagar, had expressed an opinion as to the guilt of defendant. This allegation was supported by the affidavit of Mrs. Dunlap. In a subsequent affidavit she stated that said juror "did not express any opinion as to the guilt of defendant;" and the juror himself also denied the expression of such opinion, and further stated that he had formed no opinion in reference to the matter, and knew nothing of the facts prior to the trial. Upon a trial of the issue the court decided adversely to the motion, and we think correctly. Shaw v. The State, ante, 155.

A contention is made that the verdict is too vague and uncertain to form the basis of the judgment rendered, in that the word "twenty" is so written that the letter "w" appears to be "m." An inspection of the original verdict, sent up in the record, will hardly support this contention. But if it did, the position is not maintainable. The intention of the jury is too plain and patent for discussion. For our views in regard to this matter, see Birdwell's case, 20 Southwestern Reporter, 556; Roberts' case, just decided at this term.

We deem it unnecessary to enter into a lengthy discussion of the charge. Suffice it to say, that an investigation of it discloses that every issue was fairly and fully submitted to the jury.

The defendant's rights were guarded with unusual care throughout the trial. The judgment should be affirmed, and it is so ordered.

*Affirmed.*

Judges all present and concurring.