PETER SARGENT v. THE STATE.

*No. 1266.   Decided December 21st, 1895.*

```
35   325
f35   482
```

**1.   Indictment—Presentment in Court.**

Where there are two District Courts in a county, it is not essential to the validity of an indictment that it should show, upon its face, in which of the two courts it was presented.

**2.   Continuance—New Trial—Controverting Affidavits.**

On a motion for new trial based upon the overruling of a motion for continuance for absent witnesses, the controverting affidavits for the State and the evidence upon the question of diligence may show that the testimony is not material; that the motion was made for delay, and that the absent witness is a fictitious person, or is absent by the procurement of defendant.

**3.   Murder—Evidence—Harmless Error.**

On a trial for murder, where it appeared that some time before the shooting deceased, who was drunk, was found in bed in the room of the girls of the dining room of the hotel, and that, when informed of it, Mrs. S., wife of defendant, remarked, "Very well, let him be, he won't hurt anything," and defendant objected to this testimony.   Held:  That the evidence could serve no purpose, in connection with the testimony in the case, to impair any right of defendant, even if it was inadmissible.

**4.   Same—Charge.**

On a trial for murder, where defendant has been acquitted of murder in the first degree, it is not necessary to consider the charge of the court in that regard.

**5.   Same—Manslaughter—Adequate Cause.**

On a trial for murder, a charge of the court on manslaughter, which leaves the jury absolutely untrammeled to review all the evidence in the case, in connection with the killing, in order to determine adequate cause and ascertain whether or not defendant's mind was influenced thereby, is sufficient without stating the fact or facts in evidence which would constitute adequate cause to excite passion sufficient to render the mind of defendant incapable of cool reflection.

**6. Same—Homicide in Defense of Habitation.**

On a trial for murder, where the evidence presented the issue of an unlawful intrusion into his home, defendant certainly has no right to complain of a charge of court which authorized him to slay the deceased for such intrusion, after he had resorted to all other means, except retreating, to get rid of him.

**7. Same—Right of Self-Defense—Actual and Apparent Danger.**

The right of self-defense continues as long as there is actual or apparent danger of an attack by the deceased, although he, deceased, may have been retreating when killed; but, if there is no real or apparent danger after the deceased started to retreat, then the right of self-defense ceased.

**8. Same—Charge of the Court—Self-Defense—Defendant's Standpoint.**

On a trial for murder, where the court instructed the jury, in effect, that, "In determining whether the defendant acted in his necessary self-defense, or, in what reasonably appeared to him to be in his necessary self-defense, it is the duty of the jury to look at the transaction from what the jury believe, from the evidence, was the standpoint of the defendant at the time, and consider the same in the light of the facts and circumstances as the jury believed they appeared to the defendant at the time, and not from any other standpoint; but, it was for the jury to determine from the evidence what were the appearances to the defendant, and what the standpoint of the defendant was, and in what light he, in fact, did view the facts and circumstances at the time." Held: That the charge was fair and pertinent in view of the evidence in the case.

**9. Same—Admonishing the Jury as to the Charge.**

On a trial for murder, where the court, before reading the charge to the jury, admonished them to pay careful and particular attention to each word and sentence of the charge, so that they might be advised as to the law of the case. Held: Such admonition was no part of the charge in the case; and, while eminently proper, was not required to be in writing.

APPEAL from the District Court of Tarrant. Tried below before Hon. W. D. HARRIS.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at a term of twenty years' imprisonment in the penitentiary.

Peter Sargent, this appellant, kept the Tremont hotel in the city of Fort Worth. Pat Foley, the deceased, had boarded at the hotel for some time, but it seems had been gone a week or more, and had returned on Saturday morning, the 24th of November, 1894. About 10 a. m., on that morning, Foley and one Morgan went to the hotel, both being drunk, and went up to the room which Foley had occupied, and in lying upon the bed, broke it down. Foley left the room soon after, and was found asleep in a room on the second floor, occupied by the dining room girls. One of these girls went down and informed Mrs. Sargent, wife of defendant, and she said: "Very well, let him be; he won't hurt anything." Mrs. Sargent was, and had been, looking after and managing the hotel for several weeks, her husband, the defendant, having been sick and unable to attend to business. That day, when Mrs. Sargent went to the opera, he went into the hotel office to see after matters. While in there, he was informed that the bed in Foley's room had been broken down, and instructed Campbell, the night clerk, to go and nail it up. About 2 o'clock, the dining room girls went to their rooms and found Foley asleep; woke him up, and were trying to get him to go out,

as they wanted to bathe. About this time, Campbell, the night clerk, came along, and one of the girls requested him to put Foley out. Campbell told Foley he was making too much noise. They finally succeeded in getting Foley out of the room, and he followed Campbell up to the third floor, where Campbell had gone to fix up the broken down bed. What occurred between the parties up there, is not known by the witnesses who testified at the trial. The next seen and heard of them, they came down stairs into the office of the hotel on the ground floor, where defendant was sitting, reading a paper. They were quarreling, the noise of their altercation having been heard by two of the dining room girls.

Pearl O'Neal testified: "That hearing the fuss, she started down the stairway, and when about half way down, she saw Foley running after Campbell, the night clerk, who was running toward the back door of the office. Sargent, defendant, got up in the office and went into the parlor. Foley came back and went out through the front door on to the street. When Sargent returned to the office from the parlor, he had his pistol in his hand. In from three to five minutes—just a short time— Foley came back to the front of the hotel, and Sargent was in the office. He said to Foley: 'If you come in here I will kill you!' and Foley called Sargent a son-of-a-bitch, and said: 'If you come out here on the street, I will whip you; I can come into your house as long as my trunk is there,' and saying which, he stepped into the office to within three or four feet of where Sargent was, when Sargent shot him. Foley had nothing in his hands. After the first shot, Foley turned and went out of the office, and witness ran upstairs, and heard another shot when she reached the head of the stairs."

Several witnesses testified to hearing the first shot, and looking in the direction, saw Foley on the sidewalk, about three or four feet from the door of the hotel, and going toward the street; saw a man fire upon him from the door, and the same party fired twice more before Foley got across the street. That the firing of the last three shots seemed to be very deliberate. That Foley had nothing in his hands, and his back was towards the hotel. That he fell at the fourth shot. When he was reached, immediately thereafter, no weapon was found upon him, nor upon the ground near by, nor in the office of the hotel.

Foley was taken to a hospital, where he died the next evening. Before dying, he made a statement of the occurrence, which was reduced to writing by the Deputy County Attorney, R. H. Orr; and, a predicate for the introduction of the statement, as a dying declaration, having been laid, the same was read in evidence, as follows:

"STATEMENT OF PAT FOLEY.

"FORT WORTH, TEXAS, November 25, 1894.

"Present: Howard Gunnels, Jo Adams, R. H. Orr, George Emery.

"I know my condition, and believe I am going to die. I was up stairs with the girls. The night clerk said he would tell the old man. The clerk went down and I followed him to the office; he told Sargent

that I was cutting up with the girls; Sargent told me he wanted my room.   I told him he could have it when I got my trunk out of it; that I was under no obligations to him.   Sargent then said, 'By God, I want you out of here.'   I replied, 'You can't get me out of here until I get my trunk out.'   He then went to his bed room, saying, as he went, 'By God I will get you out of here, I will go and get my gun.'   When I saw him coming I started out of the door and said to him, 'You had better not draw a gun on me, or you will get yourself into trouble.'   He replied, 'Oh, you son-of-a-bitch.'   I then heard a report and felt a sting in my thumb.   My back was to Sargent, and I was going into the street when the first shot was fired.   I then heard a second report and a third report, and then I fell.   I had no knife or other weapon on me, except a small knife in my pocket, which I did not take out.   I didn't chase the night clerk with a knife, as I have heard he said I did.   I don't owe him for any board, except for two meals and my bed.   We were in the hotel office all the time Sargent and I were talking.   I had never had any other trouble with Sargent.   He had no cause for shooting me that I know anything about.   I make this statement voluntarily.   I am thirty-two years of age, and my name is Patrick Foley."

"Taken at 11 o'clock; died at 4 p. m., Sunday, November 25th.

"Witnessed by the witnesses named."

Defendant's testimony, as a witness in his own behalf, was as follows:

"My name is Peter E. Sargent; I am the defendant in this case; I am proprietor of the Tremont hotel; I have been in that business up there —will be fourteen years this coming 4th of September; I am now in my fifty-fourth year; the state of my health at the time of this difficulty was very bad; I had been sick about six weeks from the time—local trouble— it first began to come on me until this trouble occurred it was about six weeks; the deceased was a man about thirty-two or thirty-three years old; he would weigh about one hundred and seventy; he was a very strong man, very strong; he boarded on and off there with me four or five years—go off and come back again; never had any trouble with the man in my life, not a word, except just one time, and that only just a mere circumstance; it didn't amount to anything; there was nothing charged, no words passed between us; one time he was talking to a lady working for me in the dining room, and I came right behind where Foley was sitting and I heard him curse her for a damned whore; and I went back in the kitchen and found she was crying, and I went back and asked him to apologize, and he said he would not apologize to any damned whore; that is the only thing that occurred prior to this shooting; Mr. E. C. Howell told me a threat Foley had made against me—some time I think in August it was, last August—he told me that he had threatened to kill me, 'rip my heart out,' that is the language; that is what Mr. Howell told me; I never spoke to Mr. Foley about that; I was afraid to; the day of the difficulty, I hadn't been upstairs that day, and I am positive, to the best of my knowledge and belief, I hadn't been upstairs in three weeks; I never saw the

witness, S. O. Morgan, in a room upstairs in the hotel, as testified to by him, or had no such conversation with him as he stated; I was not able to go up; not a thing of the kind ever mentioned; I never said that to that man in my life; I think that Foley went away from my house about three weeks prior to this unfortunate occurrence, about three weeks; I was not on watch at the time of this occurrence; I had not been attending to my business at all, except to buy, and I had got in a condition that they would not come to my house to take orders; I had not been on watch in three weeks; Mrs. Sargent was on watch; the first time I saw Foley that day was about half past one o'clock; he came over to the hotel office as I came from dinner—I had been to dinner, and I came through to get a tooth pick, and he came in the office; he was under the influence of liquor, and so were the two men that were with him; he had liquor enough in him to be ugly; I shook hands with him and passed the compliments of the day; the next time I saw Foley after that, he was following the clerk downstairs into the office; I was seated behind the counter reading the newspaper; just went in there for a moment to pay the bread man; my wife, she was at the opera house, and I just walked in there and just sat down in a chair a moment, and took up a paper and put my glasses on, and the clerk came downstairs first and was mumbling something about a bedstead being broken, and in a moment Foley came downstairs, and they commenced to jaw and wrangle between themselves, cursing one another; I paid no attention to it at all; I just kept on reading my newspaper, and they quarreled a little bit, and directly Foley came up to the counter and says to me:  'Have you got it in for me?'  I never paid any attention to it and kept right on.  He says, 'You God damned son-of-a-bitch, have you got it in for me?'  I says, 'No sir;' I says, 'I can't have your conduct in my house; you must get out of here;' and from that I got up.  He says, 'You got it in for me; God damn your old soul to hell, I will break your neck,' and I got up and came out to go to the kitchen to get a negro to go to get an officer, and he ran after me and struck at me, and he caught me here by the sleeve with his left hand and tore the sleeve nearly out of my coat.  I cannot see out of my right eye at all, and I gave a jerk, and he went on to the clerk, and he had a knife when he went on to the clerk, and when I saw the knife I says,  'Then I will get my gun for you right away,' and I got my gun and came out, and when I got to the door he passed right along in front of me, going out, cursing me for a son-of-a-bitch; after I got my gun and came back, I did not say anything to him; never said a word to him, because he was going out of the house, and he went out and was gone a little bit, and probably two minutes or three minutes—just talking about the unfortunate occurrence amongst ourselves—the two women on the stairs and by the night clerk, and the night clerk says,  'He has got a knife and you want to watch him.'  I says, 'I know that;' just at this moment the night clerk went and got his hammer and some nails and went off upstairs to fix the bed. As he went upstairs, that moment Foley came back, and the first thing

he done he commenced cursing me for a son-of-a-bitch, and wanted me to come out doors and fight him; I told him I didn't want to fight; from that he started to come into the house, and I says, "If you come in here to assault me again I will kill you, if it is the last thing I do." He says, 'You will * * * son-of-a-bitch.' His knife was then in his hand. When he got right in the house, about four or five feet, he made a dash at me this way, and I shot him—I tried to shoot him, I shot him again at the step, and when he got outside I thought he was trying to shoot me—I knew he had a revolver, and he most always carried it when he was drunk—and I shot him again; I was under the impression that he was trying to shoot me; I did not shoot after he fell; I didn't know he was hit until after he fell; I cannot see very well out of the other eye; have to use magnifying glasses; I was looking right out in the light, and the smoke blew back into my face whenever I would shoot; just only could see kind of an outline of him after the first shot, until he got out on the edge of the sidewalk, and there I thought he was trying to shoot me; made an effort of that kind and put his hand behind him; from what I could see he was trying to shoot me; could not see anything, just the outline was all you could see."

Cross-examination.—"I can read pretty well with my glasses. The man was standing with his hands behind him with his knife up his sleeve. I could see that knife between his hand and coat sleeve; his right hand, the one towards Pearl O'Neal. She could not see it at all. When I shot at him one hand was just about here some place, the other just down by his side. When I first shot at him the best I can say, he tried to turn around and then turned back on me again. I could not tell about his face being turned towards the street. The smoke blinded me as I was looking towards the light, and could not say whether it was the case or not. When I fired the second shot I could not see whether Foley's back or face was turned towards me. I don't know whether I could see well enough to hit him twice center in the back; I never saw. I did not hear him holler after the third shot. He never hollered at all. I didn't shoot after he hollered—he never hollered at all. After the fourth shot he didn't holler. I could not tell where Foley went when he went out of the hall just before he came back. I stepped to the door and called my clerk back. I don't think the clerk says: 'You damn son-of-a-bitch, don't come back or I will kill you.' I didn't go out on the sidewalk; I just stepped with my foot in the door. I didn't hold it out where Foley could see it. I called the clerk back; told him this was over, come into the house. Never noticed where he went. Before Foley came back the night clerk never said anything to me, only just showed me the hole he jagged in his back. When the night clerk went upstairs he went before Foley came back. I don't remember him saying anything about killing him; I don't remember that he did. After I had gone into the parlor door and got my pistol, I was standing there right in the door with my pistol in my hands. Maggie Callahan and Pearl O'Neal were at that time right on the stairs. I did not say in the

presence of Maggie Callahan and Pearl O'Neal, 'If he comes back I will kill him." I said something to him after I saw he had a knife.. I said, 'Damn him, I would go and get my gun, if I could not get him out of there any other way, and then went after the gun in my room. I think the deceased had come into the house about four or five feet when I first shot. I never was in the door, and never advanced a step. Never was within four feet of that door. I never stood in the door at all; never stood any closer than four feet. Four feet is as close as I ever was to the door. When Foley made after me with that sleeve business, Maggie Callahan and Pearl O'Neal were on the stairs. They could not see all of it. I went in through the parlor door. I was right in behind the stairway where they stood. I was going towards the kitchen for help. The directions were opposite. I told you that he caught hold of my sleeve and jerked me, and when he done that I turned to go back, and went through the parlor. When I first started, I started to go through the dining room; going away from him. These two women saw me when I got by the parlor door. I was behind the stairway, going into the kitchen. I started away from the counter. I went left oblique, away from him. He jerked me right in behind the stairway. When Ed. Campbell went out on the sidewalk I think he had one of these little poplar rounds, rocking chair rounds. I think he had that in his hands. At that time Foley had gone. I don't know where he was at all. I just noticed him going up the street. I never was on the sidewalk, only when I called the clerk. When Foley left the house, after the first shot, I think he shut the knife up and put it in his pocket. I think immediately after the first shot. Thought the motion was made when he first got down. He had it in his right hand. I think he put it in his pocket. There was all just the motion of it there; could not tell whether he shut the knife up or not. He had the knife. The smoke had cleared away then, and when he got out on the sidewalk, I could see. I just saw the motions, what I could see. I thought so—at that moment he was trying to shoot me, too. At that time he was standing kind of sideways."

Defendant made a motion to quash the indictment. The grounds of the motion were: (1) Said indictment does not appear to have been presented in the proper court. (2) It does not appear from said indictment that same was presented in the District Court of the county where the grand jury was in session. (3) It, the said indictment, does not appear to be the act of a grand jury of the proper county.

The formal part of the indictment is as follows: "The grand jurors of the State of Texas, duly elected, tried, empaneled, sworn and charged to inquire of offenses committed in Tarrant County, in the State of Texas, upon their oaths do present in and to the District Court of said county, that one Peter Sargent, etc."

Defendant's motion for continuance was overruled. And the court's refusal of the continuance was one of the grounds relied on by defendant in his motion for new trial. Upon this matter, the State filed counter

affidavits controverting the diligence.  A motion was made to strike these controverting affidavits from the record, because they were not restricted to the question of diligence, and the matters pertaining thereto. Exceptions were reserved to the admonitions and instructions given by the court verbally to the jury in connection with the charge and before reading the charge, as follows:

"Before reading you the instructions as to the law of the case, I wish to say that I desire to read it deliberately, and to have the jury give close attention to it, and endeavor, so far as they can, to comprehend and understand the same; and after the jury get to their room, that they will examine the same and all of it, until they should be able to say that they understand the same.  When jurymen swear that they will a true verdict render, according to the law and evidence, and they are not careful to see that they understand the law as given them by the court, but act in the case, and leave the court room wholly or partially unable to tell, if called on, the substance even of the law as presented, then such jurymen act unlike thinking men, but deal recklessly or carelessly with themselves.  For, if the jury fail to grasp the principles or propositions of law, as submitted to them, then it is very uncertain about their being able to find a verdict according to the law and evidence, and more uncertain about their being able to apply the evidence to the law of the case, and thereby be able to see and comprehend that the verdict that they do render is a true verdict, according to the law and the evidence."

The ground of the objection was, that the law requires the court to give all charges to the jury in writing, and because such remarks of the court were calculated to prejudice defendant's case with the jury.

*Furman & Bowlin*, attorneys for appellant.—There being two District Courts in Tarrant County, the Seventeenth and the Forty-eighth, and the law being that the indictment should show in which court it was presented, the indictment in this case should have shown whether it was presented in the Seventeenth or the Forty-eighth District Court.  General Laws, 22nd Leg., pp. 2 and 170; Willson's Crim. Stat., Secs. 1949, 1951, 2128 and 2139.

As to the action of the court in refusing to strike from the record the State's controverting affidavit, and in admitting the evidence on the hearing thereof, as shown by the record, we make the proposition as follows:  "When a defendant makes his motion for a continuance, or if having made such motion, which being overruled by the court, he is convicted, and in his motion for a new trial allege error on account of the overruling of such motion, the State can file an affidavit, controverting the allegations in such motion, as to the diligence used by defendant to procure the presence of the absent witnesses, but such affidavit, and affidavits supporting same, and the evidence thereunder should be confined solely to the question of diligence."  Willson's Crim. Stat., Secs. 2174, 2175 and 2176.

"The court erred in permitting the State to prove by the witness,

Annie Wilde, a conversation between the said witness and defendant's wife, concerning deceased, in the absence of defendant, as shown by defendant's bill of exceptions No. 3."

The evidence was clearly incompetent, as being hearsay, and was calculated to be very prejudicial to the defendant in this: that the inference was to be drawn therefrom that no objections were made to deceased being in the hotel and in the girls' room in a drunken condition, and to his disorderly and improper conduct therein, and especially was this so in view of the fact that defendant claimed to have first tried to have deceased leave the hotel on account of his drunken condition and disorderly conduct in the hotel, and misbehaving with the girls in their room. Bluman v. State, 33 Tex. Crim. Rep., 43; Washington v. State, 17 Tex. Crim. App., 203; Thompson v. State, 32 Tex. Crim. Rep., 1.

The court erred in giving verbal instructions to, and in lecturing the jury verbally before reading the charge, as shown by defendant's bill of exceptions No. 4.

The court erred in omitting in its charge to instruct the jury as to what facts and circumstances in evidence the jury should consider on the question of manslaughter in determining whether or not there was adequate cause.

Defendant excepted to the charge when given on account of such omission. The evidence tending to show "adequate cause" was two-fold:

1. That deceased, a few minutes before the fatal shooting, had unlawfully assaulted defendant's servant, in defendant's house, in his presence, with a knife, and at the same time assaulted defendant.

2. That he returned a few minutes afterwards and unlawfully entered defendant's hotel, after being warned not to do so, and assaulted defendant in his own house with a knife. See statement under second ground of motion for a new trial, supra, and defendant's evidence.

(1) The assault by deceased with a knife upon defendant's servant in his house and presence, without legal excuse, and the assault or attempted assault upon defendant at the same time, and the immediate return of the deceased to the hotel, and his unlawful attempt to enter same over defendant's protest, was sufficient "adequate cause," if it produced such a degree of anger or rage, or sudden resentment in the mind of defendant, as to render his mind incapable of cool reflection, whether or not the deceased did anything on his return to justify defendant in the belief that his purpose in returning was to renew the difficulty, and the jury should have been so instructed. (2) If deceased assaulted defendant, or attempted to assault him with a knife on his return to the hotel, as defendant testified, and defendant fired the fatal shot after deceased began his retreat, and after all danger or apparent danger to defendant was over, the defendant, under such state of facts, was not guilty of a higher grade of homicide than manslaughter, provided such assault or attempted assault by deceased produced such a degree of anger or rage, or sudden resentment or terror in the mind of defendant as to

render his mind incapable of cool reflection (a question, of course, for the jury), and the court should have so charged the jury. Wadlington v. State, 19 Tex. Crim. App., 266; Neyland v. State, 13 Tex. Crim. App., 536; Williams v. State, 15 Tex. Crim. App., 617; Goodman v. State, 4 Tex. Crim. App., 349; Ross v. State, 10 Tex. Crim. App., 455; Peter v. State, 23 Tex. Crim. App., 684; Cochran v. State, 28 Tex. Crim. App., 422; Orman v. State, 24 Tex. Crim. App., 495; Hawthorn v. State, 28 Tex. Crim. App., 212; Milrainey v. State, 33 Tex. Crim. Rep., 577; Jones v. State, 29 Tex. Crim. App., 338; Bracken v. State, Id., 362; Armstrong v. State, 33 Tex. Crim. Rep., 417; Hobbs v. State, 16 Tex. Crim. App., 523.

*Ben F. Terrell, James S. Davis* and *Mann Trice,* Assistant Attorney-General, for the State.—Where the error of the court in overruling defendant's application for continuance is assigned as a ground for new trial, the State can controvert, not only the fact of diligence, but the materiality of the absent testimony—its probable truth—and show that the motion was made for delay, and that the witnesses are absent by the procurement or consent of defendant. Code Crim. Proc., Art. 560, Secs. 3, 4 and 5, and Art. 781; Walker v. State, 13 Tex. Crim. App., 618; Gonzalez v. State, 30 Tex. Crim. App., 261; Goldsmith v. State, 32 Tex. Crim. Rep., 115; Shaw v. State, 32 Tex. Crim. Rep., 155; Norris v. State, 32 Tex. Crim. Rep., 172; Cockerell v. State, 32 Tex. Crim. Rep., 585; Attaway v. State, 31 Tex. Crim. Rep., 475; McKinney v. State, 31 Tex. Crim. Rep., 583. It is not error, if absent testimony is supplied by other testimony. Walker v. State, 13 Tex. Crim. App., 642; Allison v. State, 14 Tex. Crim. App., 402; Weathersby v. State, 29 Tex. Crim. App., 278; Hooper v. State, 29 Tex. Crim. App., 614; Gonzalez v. State, 30 Tex. Crim. App., 203; Brotherton v. State, 30 Tex. Crim. App., 369.

It was not error to overrule application for continuance because defendant could have used the testimony of the absent witness Campbell, taken on habeas corpus. Walker v. State, 13 Tex. Crim. App., 649.

Not only must probable injury, in overruling the motion, be shown, but it must also be shown that it was reasonably probable, that if the absent testimony had been before the jury, a verdict more favorable to the defendant would have resulted. Pruitt v. State, 30 Tex. Crim. App., 156; Goldsmith v. State, 32 Tex. Crim. Rep., 112; Norris v. State, 32 Tex. Crim. Rep., 172; Loakman v. State, 32 Tex. Crim. Rep., 563.

A continuance should not be granted where it is not probable that the witness can be found, or that he would swear as defendant represents, or that he would be believed, if he did so swear. Sinclair v. State, 34 Tex. Crim. Rep., 453. And the State may show that the witness was not at the place of the difficulty. McGee v. State, 31 Tex. Crim. Rep., 71; Cockerell v. State, 32 Tex. Crim. Rep., 585.

It was not error for the court to admonish the jury with regard to

their duties in considering the charge of the court, but if it was error, it was not error prejudicial to the rights of defendant. Code Crim. Proc., Art. 672; Walker v. State, 13 Tex. Crim. App., 649; Green v. State, 32 Tex. Crim. Rep., 298.

The balance of the brief is devoted to a discussion of the charge, and it is not deemed necessary to reproduce it.

HENDERSON, JUDGE.—Appellant in this case was tried under an indictment charging him with murder in the first degree, was convicted of murder in the second degree, and his punishment assessed at twenty years' confinement in the penitentiary. From the judgment and sentence of the lower court he prosecutes this appeal.

The first error complained of by appellant is that the court erred in refusing to quash the indictment in this case. He also brings up the same question on motion in arrest of judgment. The contention of appellant is that the indictment is defective, because it fails to show that it was presented in the proper court, and because it does not appear from said indictment that it was presented in the District Court of the county where the grand jury was in session, and that said indictment does not appear to be the act of the grand jury of the proper county. The indictment shows on its face, according to the authorities, that it was presented by the grand jury of the proper county, and in the proper county. Willson's Cr. Stats., § 1951 and authorities; Vanvickle v. State, 22 Tex. Crim. App., 625. The contention that the indictment should have shown on its face in which court of the two District Courts in Tarrant County it was presented is not well taken. The minutes of the court show this fact.

Appellant filed a motion for the continuance of this cause on account of the absence of the witnesses, E. L. Campbell, Charles Nolan and one Hargraves; but it appears that Hargraves subsequently came into court and testified, and so we have only to consider the other two witnesses. As to these, the question presented in the motion for a continuance is also raised in the motion for a new trial. It appears from the record that a subpoena was issued for these witnesses on the 22d of January, 1895, and return was made "Served" as to each of them on the 2d of February following. The case was set for trial on the 4th of February, and on the morning of the 4th was accordingly called for trial, and both these witnesses were absent. Writs of attachment were then issued for them, and the case passed until about 2 o'clock, when a motion for a continuance was presented to the court. On an inspection of the record we are of the opinion that the testimony of each of said witnesses, as set out in the motion for a continuance, was material to the appellant. The motion was, however, overruled, and on the motion for a new trial the overruling of the motion for a continuance as to these witnesses was involved, and the State filed a controverting or contesting affidavit. Said affidavit, while proposing to controvert the question of dilligence, also contests the materiality of the testimony of the absent witnesses, and that said

motion was made for delay, and alleges as to said witness, Campbell, that he was absent by the procurement and consent of appellant, and as to the witness, Nolan, that he was a fictitious person. In our opinion the State had the right to do this. Code Crim. Proc., Arts. 560, 565, 781; Norris v. State, 32 Tex. Crim. Rep., 172; Cockerell v. State, 32 Tex. Crim. Rep., 585; Walker v. State, 13 Tex. Crim. App., 619. The court trying the case admitted a great deal of testimony, both affidavits and oral evidence, taking up about 100 pages of the record in this case. Exception was taken to this testimony. Much of it was immaterial. However, as the matters were addressed to the court, and as all the evidence is now before us, we can eliminate such of it as appeared to be immaterial, and it seems the court below also pursued this course. Without reiterating all the testimony from the record which we think has a legitimate bearing upon the issues in this case as to said two witnesses, and after a careful examination thereof, we have reached the conclusion that the issue was fairly presented to the court below, trying. the motion, whether or not the witness Campbell was absent by the procurement and with the consent of appellant. There was evidence pro and con on this issue, and the court below seems to have regarded the absence of said witness with the connivance of the appellant as proved. As to the witness, Nolan, the court heard testimony pro and con as to whether or not he was a real or fictitious person. The State showed by a number of witnesses in a negative way that they did not know of the existence of such a person as Nolan. The officer who had the attachment for said witness on the 4th of February, also shows, by his affidavit, that he applied to appellant's counsel, and to appellant himself, to know where said witness could be found, and they stated to the officer that they had never seen and did not know such a person, and with all the people in Fort Worth, and the facilities afforded for finding such a person as Nolan, no one could be found who had ever seen said witness except the deputy sheriff, Trigg, who served the subpœna on him, and the record throws such suspicion on this man, Trigg, in connection with this case as to very much weaken our respect for his testimony. If such a man existed, some one besides Trigg in all the city of Fort Worth should have known him, and if such an important witness existed it is exceedingly strange that he had not been talked to prior to the trial by as diligent and able counsel as managed the defense in this case. Not even the witness, Thomas, who was employed to talk with the witnesses, knew of his existence. So, to our minds, it is altogether improbable that such a person existed or was at Fort Worth at the time this homicide was committed. As to the witness, Campbell, moreover, it appears that on the morning of the 4th, when the attachment was issued and placed in the hands of the deputy sheriff, he inquired of appellant's counsel as to Campbell. They informed said officer, if he is to be believed, that he need not mind about said witness, that if they wanted him they would let him know later, and this they never did. Said witness was seen by one person as late as 1 o'clock on said Monday,

and if the officer had been informed by counsel that they still wanted said witness, it is probable that he might have been procured. As to this witness, it also appears that he was used by the State on the habeas corpus trial of this case, and that he was upbraided by appellant's counsel for making his testimony stronger than he had previously stated it to them. His testimony was in the record. There is some suggestion in the record that this witness was out of the State, and the State offered to permit his testimony to be read. Appellant declined to avail himself of this opportunity. From the evidence that the record affords in this case with regard to these two witnesses, we are of the opinion that the court did not err in setting on foot this investigation to ascertain whether or not the appellant had used diligence in procuring these witnesses, and even in making it as comprehensive as he did, for it is peculiarly within the province of the District Judge, in matters of this sort, to see that the course of justice flows in its appointed channel, uncontaminated by corruption and unobstructed by fraud or villainy. In our opinion, it was competent to show that the witness, Nolan, was a fictitious person, for in such event by no amount of diligence could it ever be possible to procure his attendance in court; and it was also competent to show, as to the witness, Campbell, that he had been spirited away by the appellant in this case, for in such contingency it would negative his affidavit, made for the continuance, that said witness was not absent by his procurement or with his consent. The motion for a new trial on this ground was properly overruled, and the court did not err in refusing to grant a motion for a new trial.

The only exception taken to the admission of evidence is contained in appellant's third bill of exceptions. It appears that Annie Wilde, a witness for the State, on direct examination, testified that she met Pat Foley about 11 o'clock on the day of the shooting. He was not doing anything; only standing around. He was intoxicated, and that was the last time she saw him until in the evening. About 1 or 2 o'clock she found him asleep in the dining room girls' room, on the bed. Said witness was then asked by the State to tell the jury what she did about it, if anything, and she answered, "I went down and told Mrs. Sargent he was up there, and Mrs. Sargent remarked, "Very well. Let him be; he won't hurt anything." To this latter testimony the appellant objected. If it be conceded that this testimony was not admissible, yet we fail to discover in what respect it was injurious to the appellant. This was some time before the homicide, and merely showed the condition of appellant at that time; and what Mrs. Sargent said, "to let him alone," could serve no purpose, in connection with the testimony in this case, to impair any right of appellant.

The court in this case gave a lengthy charge covering murder in the first degree, murder in the second degree, manslaughter and self-defense. This charge was furnished appellant's counsel an hour or more before it was delivered to the jury. They asked no charges, but merely contented themselves with objecting to the court's charge. A number of errors

are assigned with reference to the court's charge, and said charges criticised by appellant's counsel in an elaborate bill of exceptions. We have examined said bill in connection with the charge given, and fail to discover the errors complained of. Appellant was acquitted of murder in the first degree, and it is not necessary to consider the charge in that regard at all. We have examined the charge on murder in the second degree, and the court's definition of implied malice, and find no error in connection therewith. Appellant complains that the charge on manslaughter was not a charge on the evidence presenting that phase of the case, but was an abstract charge. It is true, in this connection, the court did not state what. fact or facts in evidence would constitute adequate cause to excite passion sufficient to render the mind of appellant incapable of cool reflection, but he told the jury in a general way that adequate cause "is such cause as would commonly produce a degree of anger, rage, sudden resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Any condition of circumstances which is capable of creating anger, rage, sudden resentment, or terror, in a person of ordinary temper, and which actually does produce the same in the person doing the killing, is an adequate cause." So that the charge left the jury absolutely untrammeled, to review all the evidence in the case in connection with the killing, to determine the adequate cause, and to ascertain whether or not appellant's mind was influenced thereby. In this we see no error. If another course had been pursued, and particular facts had been singled out, there might have been some complaint that all of the facts which would go to make up adequate cause were not cited in the charge. The charge on self-defense was comprehensive, and covered the entire field of the evidence. The court charged both on an assault made on appellant in a manner calculated to cause him to apprehend danger to his life or serious bodily injury, and also to the effect that, if the jury believed that "the attack made upon the defendant was not such as to produce a reasonable apprehension of death nor of serious bodily injury in defendant's mind, but was an attack upon his person of a milder character, or was an unlawful intrusion upon the defendant's premises after being duly notified that he could no longer remain a guest at the hotel, in such case the defendant would have the right of self-defense," but before exercising it he would have to resort to all other means except retreating before he would be authorized to slay the deceased. There was a phase of the evidence which presented an assault of this character, and certainly the appellant would not be permitted to complain that the charge of the court authorized him to slay the deceased if he made an unlawful intrusion into his hotel, and in such case he would be authorized to kill the deceased after he had resorted to all other reasonable means to get rid of him, except retreating. This charge was certainly as liberal as the appellant could have asked. Nor did the court err in telling the jury that the appellant's right of self-defense would continue as long as he was in actual

or apparent danger of an attack by the deceased, although deceased was killed while retreating, but that, if he was in no real or apparent danger after deceased had left the scene of the difficulty and started to retreat, then his right of self-defense ceased.　Nor, in this case, was it improper to tell the jury, in effect, that "in determining whether the defendant acted in his necessary self-defense, or in what reasonably appeared to him to be his necessary self-defense, it is the duty of the jury to look at the transaction from what the jury believe from the evidence was the standpoint of the defendant at the time, and consider the same in the light of the facts and circumstances as the jury believed they appeared to the defendant at the time, and not from any other standpoint; but it is for the jury to determine from the evidence what were the appearances to the defendant, and what the standpoint of the defendant was, and in what light he in fact did view the facts and circumstances at the time."　This charge, we believe, was fair, and, in view of the evidence in this case, was a pertinent charge.　The appellant insists that the court should have charged the jury, in substance, that if the deceased was making an assault on the appellant with a knife, a deadly weapon, then the law would presume that he fully intended to kill the appellant, and that in such event they would give the appellant the benefit of such presumption.　As we have said before, the charge of the court on the subject of self-defense presented all the issues of the case fairly, and there was nothing in the evidence to call for such a charge. It appears from the record in this case that before the court read his charge to the jury, he admonished them to pay particular and careful attention to each word and sentence of the charge, so that they might be advised as to the law of the case.　The appellant saved a bill of exceptions to this action of the judge, and insists that, as a part of the charge, the same should have been in writing, and that it was no part of the duty of the judge to so admonish the jury.　We do not regard the admonition as any part of the charge of the court.　It was the proper admonition, and no word or sentence thereof was calculated to bias the mind of the jury one way or another in relation to the case they were then trying, but merely a suggestion on the part of the court to pay particular and careful attention to his charge.　In this there was no error. We have carefully examined the evidence in this case, and believe that the same authorized the finding by the jury that the appellant was guilty of murder in the second degree, and assessing the punishment at twenty years in the penitentiary.　The judgment and sentence of the lower court are affirmed.

*Affirmed.*