### WALTER FRENCH v. THE STATE.

No. 4623.    Decided March 17, 1909.

#### 1.—Murder—Charge of Court—Defense of Home.

Where upon trial for murder the evidence showed that the defendant acted in defense of his home against an unwarranted intrusion upon it by the deceased, the court erred in failing to charge the jury that the defendant had a right to defend his home against the unlawful entry of the deceased; and the court's charge that such entry might constitute adequate cause was on the weight of the evidence and reversible error.

#### 2.—Same—Absence of Judge.

See opinion for suggestion that in all cases the trial judge should remain in complete control of the trial. Following Bateson v. State, 46 Texas Crim. Rep., 34, and other cases.

Appeal from the District Court of Bowie. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Hart, Mahaffey & Thomas,* for appellant.—Cited cases in the opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree and his punishment assessed at five years confinement in the penitentiary.

The second ground of the motion for a new trial complains that the court erred in failing to charge the jury the law with reference to defendant's right to defend his home against the unlawful entry of the same by deceased, appellant insisting that the evidence clearly

raised this issue and imperatively demanded 'the submission of the same by the court to the jury. The facts relied upon by appellant suggesting the issue contended for are as follows: The undisputed facts in the case show that deceased was shot and killed by the appellant on the front porch of appellant's home, in the city of Texarkana. The facts are further undisputed that deceased and appellant had a quarrel or altercation on the morning deceased was killed, at the city hall saloon in said city. That appellant told deceased to stay away from his home, and left the saloon and started home. It was further undisputed that on the way home appellant met the constable, and complained to him that deceased had been following him around town that morning and trying to have trouble with him, and asked the constable for protection. Appellant testified: "When I got to Olive and 12th, I met Mr. Hargett. I holloed at him, and he stopped, and I told him, 'There is a fellow down town who has been following me all over town, and give me a genteel good cursing. I can't afford to fight him. I want to know if I can get some protection.' He asked me to tell him who the fellow was, and I told him. He said, 'I will go back. If I can find him, I will arrest him.' I told him I wish he would. I was in no shape to have any trouble of any sort. Mr. Hargett said he would do that, and left me. Just as he turned the corner, I saw Dave coming out of State Street into Pine. I holloed at him. He was then on the corner, coming into Pine Street. I holloed at him and stopped him. He was then just coming out of State Street into Pine—just turned about two or three steps maybe. 'Q. Which direction with reference to your house?' A. On out in the direction of my house. I holloed at him and stopped him. When I holloed at him, he had both hands out of his pocket. When he looked back and recognized me, he put his hand in his pocket and pulled out his knife. I said, 'Now, Dave, you have cursed me plenty this morning. I don't think you ought to follow me to my house. I have forbidden you to go there. You go back to town and quit following me.' He said, 'God-damn you, you wouldn't fight me down town; maybe, you cowardly son-of-a-bitch, you will fight me in the house.' I said: 'If you follow me to my house I am going to hurt you.' He said: 'You have got to do it; my heart is right for you.' So I walked on—maybe three or four steps ahead of him—just far enough to keep him from cutting me in the back with his knife. Q. What direction? A. The direction of my house. Just kept far enough to keep out of arm's reach—maybe further at times. At one time he got pretty close to me. Just as I was crossing 15th Street I made a leap or two and got out of the way of him. I walked into my house, and in the north room. Q. Now, stop right there. When you went into your house, where was Totten? A. Maybe just about at the gate; maybe he hadn't reached the gate. It was about six or seven steps from the gate into the house. I went into the door of

the north room, .where my mother slept. The south room is the room where my wife was in bed. Her and the children slept in there. I went in the room and got my pistol out of the tray of my trunk. By that time Dave was upon the porch. I came to the door and reached out and caught him in the collar on the left hand side and shoved him back and said: 'You get out of here.' He said, I just didn't hear what he said. He walked up on the porch and struck at me with the knife, and I shot at him. He bowed himself to make another lick, and I shot the other two shots like that." The witness further testified: "Q. Just as he stepped up on the porch, you came out with the pistol in your hand? A. No, sir. When he came on the porch, I shoved him off the porch. Then he opened his knife and come on the porch again, and walked up and struck at me. before I shot him." He further testified: "I just caught him in the collar and shoved him off and said, 'I told you to keep away from here.'" The witness further testified with reference to the quarrel at the city hall saloon that morning as follows: "I peeped in the door and saw Louis (the evidence shows that Louis was appellant's son, a boy about sixteen years of age) standing up at the bar. I heard Dave say, 'God-damn you, give me two drinks.' I just walked up to Louis and touched him and said, 'You get out of here. You skin your nut home, and do it quick; and gave him the bottle I had got at the drugstore. When Louis left, Dave come up to me and said, 'God-damn you, you don't want your children to associate with me.' I said, 'You know, Dave, I can hardly control that boy as it is. You are a man—call yourself my friend—and you brace that boy up to come here. I consider you my enemy. Don't you ever put your foot in my house no more.'" He further testified: "I had been living there nearly two years, and my wife and family lived there. That was my home." The undisputed facts further show that appellant's wife was at the time in the last stages of consumption, at their home, where the killing occurred, and that she died within a month or two after the killing. It was further undisputed that from the city hall saloon, where the difficulty occurred, to appellant's home, it was about sixteen blocks, or a little over a mile. The witnesses, Ed Williams and Lula Duckett also testified as to seeing deceased following appellant home.

The charge of the court did not submit the issue asked by appellant, but did tell the jury that an attempted unlawful entry of the same by deceased, over the protest of the appellant, might constitute adequate cause to reduce the killing to manslaughter. The latter charge, we do not think, should have been submitted. It is a comment upon the weight of evidence. It is true it is favorable to appellant, but not a proper charge. The charge on the issue above contended for by appellant wherein the court was asked to charge the article authorizing a defense of his home, was a pertinent issue presented by the evidence and should have been submitted to

the jury. The evidence shows clearly that appellant had a right and was defending an unwarranted intrusion upon his home. He pushed deceased back off the gallery of the home one or more times before any shots were fired, telling him he must not come into his home. The statute of this State authorizes one to act immediately in defense of his person against murder, maiming, castration, etc., without retreating and to act instantly where his life is threatened or serious bodily injury. The other article of the Code says that appellant has a right to defend his person or his property against any other unlawful violence than those enumerated above. The following are authorities on this question: Bryant v. State, 51 Texas Crim. Rep., 66; Richardson v. State, 7 Texas Crim. App., 486; Weaver v. State, 19 Texas Crim. App., 547; Dyson v. State, 14 Texas Crim. App., 463; Pryse v. State, 113 S. W. Rep., 938; McGlothlin v. State, 53 S. W. Rep., 869; Lilly v. State, 20 Texas Crim. App., 1; Sims v. State, 36 Texas Crim. Rep., 154, 36 S. W. Rep., 256; Ross v. State, 10 Texas Crim. App., 455; Hopkins v. State, 53 S. W. Rep., 619; Woodring v. State, 33 Texas Crim. Rep., 26; Morrison v. State, 39 Texas Crim. Rep., 519, 47 S. W. Rep., 369; 3 Greenl. on Ev. (16th ed.), 125, sec. 117; 1 Bishop's Crim. Law (7th ed.), secs. 857-8-9-60; and for discussion of a cognate question see Reece Vinson v. State, this day decided.

There are other questions presented in this. record, among others, the absence of the judge from the bench. This matter and the complaint of appellant of the organization of the jury will not likely occur on another trial. We do not deem it necessary here to pass upon same, but suggest that in all cases the judge should remain in complete control of the trial. For authorities on this question see Batson v. State, 46 Texas Crim. Rep., 34, 80 S. W. Rep., 88; Evans v. State, 46 Texas Crim. Rep., 476, 80 S. W. Rep., 1017; Goodman v. State, 47 Texas Crim. Rep., 388, 83 S. W. Rep., 196; Carney v. State, 47 Texas Crim. Rep., 566, 85 S. W. Rep., 7; Anderson v. State, 50 Texas Crim. Rep., 134, 95 S. W. Rep., 1037; Williams v. State, 51 Texas Crim. Rep., 361, 99 S. W. Rep., 1000.

For the error pointed out, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*