# MAY 24, 1933

· W. A. BEGGS V. THE STATE.

No. 15802.   Delivered April 12, 1933.
Rehearing Denied May 24, 1933.
Reported in 60 S. W. (2d) 241.

The opinion states the case.

*Nolan Queen,* of Weatherford, and *W. E. Myres,* of Fort Worth, for appellant.

*John P. Simpson* and *John D. McComb,* both of Jacksboro, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, fifteen years in the penitentiary.

The background and surroundings of this case are unusual. Deceased and his slayer were neighbors, living on the same road some two miles apart.   According to the testimony of appellant and his family, the two men were friends, with no ill-feeling between them.   The state's testimony suggests a different situation.

The oldest son of appellant lived about a quarter of a mile from appellant, and on the same road referred to.   The killing took place at the home of said son, Theodore Beggs, on the night of December 19, 1931.   Theo and deceased, Ham, were both in Jacksboro that day.   Theo testified that he saw Ham in town,

and saw him about sundown help push Carney's car out of a ditch. Carney lived about a half mile north of Theo and on the same road which ran south past appellant's house. About 7:30 p. m., two hours after Theo saw Ham helping Carney, Ham was shot at Theo's house. The state showed that a few weeks before the killing Theo was found by Ham at a still in a pasture controlled by Ham, who evidently objected to the presence of the still and ordered Theo to "take that mess out of here," which Theo agreed to do. The state also showed by another witness that about said time appellant left his house and came down to his gate one moonlight night, when a man passed riding a paint horse such as Ham rode, appellant saying to the man, "I thought you were George Ham." Accounting for his presence with a rifle at Theo's house on the night of the killing, appellant and his family said they heard from their house a holloing, which they thought came from Theo's house, and that appellant put his clothes on, took his gun, and went up there. The state put on the stand four of Theo's nearest neighbors, each of whom was at home at the time, and all said they heard no holloing. The body of Ham lay in Theo's house an hour or more before the officers got there after the killing. The officers found a pint bottle in Ham's *front trouser pocket,* partly filled with whisky. Theo's wife testified that she heard Ham tell her husband in a conversation out in the road shortly before the killing that he was drinking. The sheriff who came to the Beggs' home at once after notification of the killing, the undertaker who handled the body, and a number of disinterested witnesses who saw and talked with Ham in Jacksboro that afternoon, including Mrs. Carney, at whose home Ham was that night until a few moments before he was killed, all testified that they saw no indication that Ham was drinking, saw no whisky, and smelled none on his breath or body.

Appellant testified that Ham was on the porch of Theo's house when shot, and that he fell there. Ham's hat was found on the ground northeast from said porch some ten or twelve feet distant from it. Appellant testified that he was in the house near a bed when he fired his rifle; that Ham was coming from the northeast; that the house faced east. Appellant said Ham came on the north side of the porch, and advanced to the south side of the door, and about the time or a little before he ran against the door facing, he, appellant, fired. Other testimony showed that the bullet entered in front near the right shoulder of deceased and made its exit in the back

near the left shoulder, apparently a physical impossibility if the shooting occurred as appellant said it did.

Appellant and Theo testified that soon after appellant got to Theo's house a man from the road called "Hello, Pedro," (that seeming to be Theo's nickname). Theo testified that he went out, stepped around the corner of the house, and called "Hello." The man in the road said, "Come out here." Theo said he told the man he could not come out there, and the man said, "If you can not come out here, I can come in there," to which Theo replied, "No, you had better go on and not come in here," or something of that sort. Theo then went back in the house. Appellant testified that he heard this conversation between Theo and the man in the road, and when his son came back in the house he told him he had better go and see about his mother. He testified that he told Theo he would stay there with his family. He said Theo left. We quote what appellant then said: "Right then I thought I heard a noise right at the northeast corner of the house. I opened the front door enough to look out and see if I could discover where that voice was out there; just at that time I heard some one jump upon the gallery, and that attracted my attention. When I looked around it looked like to me I saw the bulk of a man almost in my face. I said 'Stop.' As I said that I jumped back, and it didn't stop, and of course I thought I was in danger; I was scared. I for a fact thought I was in danger of death or of serious bodily injury, or I would not have fired the gun. As far as I could see the man would have to be coming towards me from the northeast corner of the gallery to jump on it there and never check at all until he went against the south door facing. About the time he hit this door facing, or maybe a little before, I fired the gun. I didn't have time to get the gun up to my shoulder. I had it down in my right hand, when I opened the door, and I didn't have time to throw the gun to my shoulder. And I jumped back and told him to stop. He didn't stop, and I fired. I fired the gun from my side. It seems to me like the man had no more than fallen until Theodore appeared at the porch where I was."

Theo testified that when he got back in the house after his conversation with the man in the road, his father told him to go and see about his mother. We quote what he then said: "I started on and got about to the fence. On the northeast of the house I heard foot-steps on the porch and I wheeled around, and I saw the bulk of a man on the porch, and he went right on to the door, and then I heard the gun fire, and looked around and saw the flash of the gun. I was southeast

from the corner of the house then; that is the trail I would have to follow in going to my mother, and I had started to her. I saw the blaze from the gun shot. The fire from the gun was right in the door, and the body I saw was right against the door, it looked like to me."

We find in appellant's testimony this also: "When I got my head out of the door I heard this noise of a man jumping on the porch and I jumped back and raised the gun between he and I; I raised the gun up like this about half way between my hip and shoulder. When I told him to stop I was excited, and he didn't stop and I fired. I didn't ask him who he was, because he was close on me then, and he didn't make any attempt to stop at all. It looked like he didn't try to stop at all; he had hit the south side of that door, and about that time I fired. I was about two feet back in the room standing right by the foot of the bed when I fired. I was a little west of the south facing of the door."

In another place appellant testified as follows: "This party approached the front door from the north end of the porch. The gate is northeast from the porch. Anyone coming in at the gate would approach the door from the north end of the porch. I had told the man to stop, and he had been told to go on, and it was in the dark with everything going on in the country, and I thought he was a drunken man or a crazy man from the noise he had been making; I believed there was something wrong with the man that had been making this noise, and I shot believing either my life was in danger or that I was in danger of his doing me serious bodily harm or injury."

Regarding what took place immediately before the shooting, appellant testified that he told the man to stop. It must be borne in mind that it was raining at the time and the night was dark. There was no light in the front room of the house where appellant was. Theo testified that he was a few steps from the porch at this time, and that he did not hear either appellant or the man who was shot, say anything. Mrs. Theo was in the next room to that in which appellant was and testified that she did not hear the man say anything before the shooting. Both of these witnesses had made written statements on this point soon after the killing.

As we understand appellant, he asserts error in the refusal of his special charge No. 3, which was as follows: "You are further charged as a matter of law that if the defendant at the time he shot the deceased was on his own property and at the home of his son, and that the deceased came upon the defendant's property and into the home of the defendant's son

over the protests of the defendant or his son, then in that event the defendant would have a right to use such force as to him appeared necessary even to the taking of the life of the deceased in protecting the defendant's own life, the life of his son or his son's family and the defendant's property, or if the defendant as viewed from his standpoint at the time and under the circumstances in question was in fear of serious bodily injury to himself, to his son or any member of his son's family, then in that event I charge you that is the law that the defendant would be justified in taking the life of the deceased and if you so find you will acquit the defendant and so say by your verdict."

The ground of appellant's complaint is that he was entitled to a charge on his right to protect his property, or to prevent intrusion into the home of his son. We have set out the defensive testimony at some length for the reason that the facts of each case must determine the law applicable. Appellant repeatedly affirmed that he thought he was in danger of death or serious bodily injury. He said, "I shot believing either that my life was in danger or that I was in danger of his doing me serious bodily harm or injury." Upon this testimony, and the defensive issue thus supported, appellant was given a charge to which he made no exception. The jury were told to acquit if from appellant's standpoint it reasonably appeared that he or his family were in danger of loss of life or serious bodily injury at the hands of deceased. Appellant nowhere claimed that deceased was attempting to take or injure any property of himself or his son. The special charge above quoted is manifestly incorrect, and the law being as appears in articles 1221, 1222, 1224, and 1227, P. C., and the facts as we have above quoted, we can not see how appellant can claim that he killed deceased in defense of property, or that the charge requested should, under any circumstances, have been given.

In his brief appellant cites Louder v. State, 119 Texas Crim. Rep., 438; Mack v. State, 97 Texas Crim. Rep., 583; French v. State, 55 Texas Crim. Rep., 538, and Newman v. State, 58 Texas Crim. Rep., 443. All have been examined. The facts of said cases are very different from those in this record. In Louder's case, from the standpoint of the defense, some man was kicking and knocking at the door of the accused at night, as if trying to break it down. The accused asked who was there and got no response. He ran into another room and got his gun. The party outside came to another door and threw something against it. Louder testified that he opened the door and fired several shots to frighten the party, then himself ran away. The

defensive theory in that case was, as stated in the opinion, that appellant had a right to prevent an entry by one he supposed was going to commit theft or burglary. A special charge (not set out) was refused, but one presenting this theory was given, but it was deemed by this court too restrictive. We note also that there was another error set out in the opinion in that case calling for reversal.

In Mack's case, supra, a man who had attacked Mack with an axe, and who then threatened to kill him if he was the last negro on earth, was seen in a few minutes after the attack coming toward Mack's house. The latter and his wife got in the house. Both testified that they told deceased not to come in, and when he persisted in trying to enter Mack shot him. Probably what we said in that opinion, in effect, that the court should have given the substance of a special charge asked in regard to Mack's right to *defend his habitation,* would have been more accurate and sound, at least we would have been better understood, had we said that a charge should have been given in substance that Mack had a right to take the life of deceased if it reasonably appeared to him that deceased was in the act of breaking and entering his home for the purpose of committing murder, or after some act of deceased showing evidently an intent to commit such offense.

In the French case, supra, the record showed that deceased had been following French around his home town, cursing and abusing him, trying to cut him with a knife, and that he followed French a mile to the home of the latter over French's repeated protests. French's wife was in the last stages of consumption in his home. He told deceased if he followed him home he, French, would hurt him. Deceased did follow him home, came up on the porch, tried to cut French with a knife, and French shot him. The language in that opinion in saying that French had a right to defend an "unwarranted intrusion upon his home" was true under the facts of that case, but should not be taken as laying down a general rule of law that every man who merely makes an unwarranted intrusion upon another man's premises may be killed therefor, regardless.

In Newman's case, supra, parties were observed slipping along toward Newman's house in the nighttime, armed with what Newman believed to be a pistol. The same party had been observed peeping in windows earlier in the night. Newman went into his kitchen and in going knocked over a chair. He testified that he saw the party outside throw up his hand with something in it that looked like a pistol. Newman fired. This court said in an opinion reversing the case, that the pro-

visions of article 675 (now article 1222, P. C.) should have been given in the charge. Such charge would properly have authorized an acquittal if the jury believed that Newman killed deceased in preventing a robbery or a burglary of his house, or a murder. If the jury believed Newman, he had evidently seen "some act done" by the party outside showing evidently an intent to commit such offense. Williams v. State, 129 S. W., 838, is referred to, and reflects a case where deceased threatened to take from appellant a gun, and was apparently trying to do so at the time he was killed. Said party also threatened to kill Williams if necessary in order to get said gun, and there was evidence before the court supporting the accused's belief that the deceased purposed taking his life if necessary in order to get the gun. We are not able to make application here of the holding there, there being pertinent testimony supporting what we have just said.

This court said in Richardson v. State, 91 Texas Crim. Rep., 323:

"The facts do not impress us as presenting the issue that the homicide was in defense of property, but the true issue was whether it was in defense of appellant's person. If the issue existed, we think the special charges requested were not pertinent to present it. They ignored the essential elements of the law of homicide in defense of property, namely, that of resorting to other means before taking life. In the case of Wells v. State, 63 Texas Crim. Rep., 622, Presiding Judge Davidson, speaking for the court, said:

" 'They were some feet apart; the distance is made uncertain by the varying testimony of the witnesses, the defendant's evidence putting him at the door, the state's witnesses putting him back from the door. Appellant was in the room and deceased upon a gallery. The law requires before killing the possessor of the house must use every other reasonable effort in his power to repel the intrusion in order to be justified in taking human life. Where a party is an intruder or trespasses upon the habitation of another, or being his guest, puts himself wrong by his conduct in the house, the owner has a right to put him out, provided he uses no more force or greater or more dangerous means than was necessary to effect the expulsion of the party. Turner v. State, 16 Texas App., 378; Stanley v. State, 16 Texas App., 392; Hinton v. State, 24 Texas, 454. Reasonable force must be used. McCray v. State, 38 Texas Crim. Rep., 609.'

Again in said opinion we wrote as follows: "The fact that the homicide took place upon the premises in controversy did

not characterize it as a homicide in defense of the property. Such a construction of it would have been manifestly against the rights of the appellant. From his standpoint, he was attacked by the deceased and fired to save his life. His right to defend his person was far broader than his right to defend his property."

In Wells. v. State, 63 Texas Crim. Rep., 618, opinion by Judge Davidson, and in Sargent v. State, 35 Texas Crim. Rep., 325, opinion by Judge Henderson, we said that when the issue was claimed resistance to an unlawful entrance into the house of an accused, the charge should tell the jury that the accused would not be justified in killing in such case without exhausting all other reasonable means to stop deceased before resorting to the act of killing him. We think the observation of Judge Morrow in the Richardson case, supra, entirely apt and applicable to the special charge requested in this case, and that this record sets out no facts calling for a charge on a killing in defense of property. We have not gone into the proposition of the right of appellant to act in defense of the home or property of another, because there was no exception to the charge on this ground, and no special charge presenting the issue.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—We have considered appellant's motion for rehearing, but remain of opinion that correct disposition was made of the case originally.

The motion for rehearing is overruled.

*Overruled.*