## J. R. SIMS v. THE STATE.

*No. 868.   Decided June 3rd, 1896.*

### 1. Murder—Arraignment—Special Venire.

Arts. 544, et. seq., Code Crim. Proc., provide that a defendant cannot be arraigned until two entire days after he has been served with a copy of the indictment, in order that he may have an opportunity to present all necessary exceptions and demurrers to the indictment. But, these statutes do not require that a special venire should have been summoned, and that the jury should be present when the defendant is arraigned.

### 2. Same—Change of Venue.

A motion for change of venue may be heard and determined before the parties have announced ready for trial; and, it is not required that a special venire should have been drawn and summoned before the motion for change of venue can be acted upon.

### 3. Same—Impeachment of Witness—Contradictory Statements.

On a trial for murder, where a witness' testimony is in conflict with and contradictory to, his previous statements, his testimony taken at the inquest and examining trials, is competent to show that he had made the same or similar statements, shortly after the occurrence, as those testified to by him as a witness upon the stand; and, it makes no difference that those other statements were made under oath in the previous examinations.

### 4. Same—Evidence—Dying Declarations.

On a trial for murder, where it appeared that deceased was shot at 8 or 9 o'clock a. m.; died about 1 or 2 o'clock p. m.; that he was suffering greatly during the time; that at no time did he express a hope of recovery; that his physician had informed him there was no chance for him to recover; that his daughter threw her arms about him, and began crying, when he remarked to her, "All is well." Held: His declarations were properly admitted as dying declarations.

### 5. Same.

Statements made by the deceased just after he was shot and subsequently before his death, to the effect that, "Sims ought not to have shot me:" and, "I didn't think that Sims was going to shoot," are admissible as dying declarations.

### 6. Same—Presence of Jury When Predicate for is Laid.

While the predicate, for the admission of dying declarations, is always primarily a question for the court, still it is the better practice to have the jury hear all the testimony in this connection, so they may be fully advised of the circumstances under which the dying declarations were made.

### 7. Change of Venue—Rearraignment and Plea.

Where the venue has been changed, and the party has been arraigned, and has pleaded in the county where the prosecution began, it is not necessary that he should be rearraigned and required to plead in the county to which the venue has been changed.

**8. Same—Reading Indictment to Jury.**

On a trial for murder, where the venue has been changed, and it appeared that prior thereto, in the county of the institution of the prosecution, defendant had been arraigned, the indictment having been read to him, to which his plea of not guilty had also been entered, and the indictment was not read to the jury on the trial until several of the witnesses had testified. Held, by HENDERSON, Judge: That it was unnecessary to read the indictment again to the jury, inasmuch as issue had already been joined upon it. HURT, Presiding Judge, and DAVIDSON, Judge, decline to express an opinion upon this point, as it is not likely to arise again.

**9. Same—Defense of Property—Charge.**

· On a trial for murder, where one of the defenses was, that the homicide was in defense of property against an unlawful and violent attack upon it, and the charge of the court made the possession of defendant depend upon his "rightful possession." Held: Erroneous—under Penal Code, Art. 680, Subdiv. 2, the possession is only required to be "legal;" and a possession might be a "legal" one, though not founded in right and not a "rightful" one; and where there was some question as to who was the owner, and had the right of possession to the property, such a charge was calculated to prejudice the defendant.

**10. Same—Resorting to Other Means—Charge.**

Where one of the defenses was an unlawful attack upon property (attempting to remove a fence), and there was some testimony suggesting that defendant could have resorted to an injunction. Held: That a charge of the court instructing the jury that, before defendant could rely upon self-defense, in protection of property, he should "have resorted to every effort in his power, except killing the deceased," should have eliminated the matter of the injunction and have told the jury that defendant was not required to resort to that measure.

**11. Same—Self-defense Against a Trespasser.**

One, who is the owner and in possession of property, has a right to use such force as is necessary to prevent a forcible trespass upon it; and, if in doing so, he is compelled to kill, he is justifiable. And where a trespasser goes upon the property with intent and with the means to commit a felony, if necessary to accomplish the end intended, the owner of the property may repel force by force.

**12. Same—Charge.**

Where a controversy between the parties grew out of the deceased's demand for, and insistance upon his right to remove a fence of which defendant was in possession, and deceased came with employees and armed with a shotgun, manifesting his intention to remove the fence. Held: Defendant was not bound to retreat; was not bound to resort to any other means than such as were at his command at the time; and, if it became necessary, in order to repel the force used by deceased while he was in the very act of his unlawful and violent attack upon the fence, to kill him, he could not be convicted of any offense; and the charge should have so instructed the jury in effect; and further, that if they believed, that defendant was in possession of the fence, then he had the right to protect it and prevent its removal; and, if, while he was doing only what was necessary to prevent said removal, deceased made an assault upon him with his gun, causing him reasonable apprehension of his life or serious bodily injury, then defendant would have the right to slay deceased.

APPEAL from the District Court of Victoria. Tried below before Hon. S. F. GRIMES.

Appellant, by indictment found by the grand jury of Calhoun County, was charged with the murder of Louis Foster on the 2nd day of October, 1894. The indictment was returned into court in Calhoun County on the 13th day of November, 1894. On the 16th day of November, 1894, upon motion of the District Attorney, stating the statutory grounds, after hearing the evidence in support of the motion, the court changed the venue of the case to Victoria County. At the time this motion was

heard and granted, the jury had been discharged, no special venire had been ordered summoned to try the case, no preliminary questions had been presented by the defendant, and neither the State nor the defendant had announced ready for trial, nor had the case been called for trial, and owing to the fact that the term of that court did not last long enough to enable the case to be tried, it could not have been tried at that term. These matters were called to the attention of the court, and objection made to the hearing of the motion and acting upon it then, made by the defendant, but they were overruled and the venue changed.

At the first term of the court thereafter in Victoria County, exception to the jurisdiction of that court was made by the defendant, and motion made to return the case to the County of Calhoun. This motion was overruled by the court.

The case was continued for two terms by the defendant, and at the November term, 1895, it came on to be tried.

The evidence in the case shows that Sims was H. C. Clark's agent, and in charge of his ranch in Victoria and Calhoun Counties, and rightfully, as such agent and manager, in possession of the lands in Clark's pasture and the fence, upon the line of which the homicide occurred. The evidence shows that the fence which divides the lands of Louis Foster and H. C. Clark, and upon which the homicide occurred, was built in 1876 by Jacob Garner, a former owner of the pasture that Clark owned at the time of the homicide. It further shows that the fence was placed there by Garner under instructions from W. H. Allen, a surveyor of Victoria County, who had been employed by Garner to fix the line for the fence. Allen told Garner that the southwest line of his (Garner's) land was twenty varas outside the line where the fence was built, so that the fence as built left a strip of twenty varas in width outside of Garner's enclosure, and inside the pasture enclosure of Louis Foster.

Garner testified that he had held possession of all the land inside his enclosure and of the fence, up to the time he had sold the land to Regan, who sold to the Traylors, who sold to Clark, that he had also had possession while the land was owned by Regan and the Traylors, for them, and that during the time he had been in possession he had never heard his title questioned. Clark testified that he had bought the land and the fence from the Traylors in 1888 or 1889, that he had always claimed all the land in the enclosure and the fence, and had never heard his title questioned until about 1891, when Foster, having bought the adjoining surveys on the southwest of his land, or an interest in them, set up claim to a strip of land inside his pasture. It was in evidence that on one occasion, Louis Foster, Jr., the son of deceased, told Sims that he was going to put cattle in Clark's pasture, claiming the right to do so upon the ground that his father had land inside the pasture, that Sims told him not to do so until he could write to Mr. Clark, who lived in Dallas, about it. That he did write to Mr. Clark, who instructed him to allow Foster to put them in, upon condition that he (Clark) was allowed by Foster to put a like number in Foster's pasture later on in the season,

when he (Clark) might need pasturage. This was not agreed to. Louis Foster, the son, put into the pasture 100 head of cattle, or beeves, and shortly thereafter Sims turned them back into Foster's pasture.

It further appeared, that on one occasion, Clark offered to give Foster the land he claimed inside his pasture, about 300 acres, for a strip of about fifty acres, upon the upper side of Foster's pasture, which Clark wanted, so as to straighten his line of fence. This proposition was declined by Foster, who still insisted that the land inside Clark's pasture that he claimed was his and that when he got ready he was going to take it.

There was evidence that Foster had on one occasion said that the land was his, and that he was going to take it with a shotgun when he got ready, and that that thing Sims could not stop him. Also that he had used threatening expressions against Sims, about an animal that Sims had by mistake branded in Clark's brand, that belonged to Foster, but which he had almost immediately counter-branded when the mistake was discovered.

During the week before the homicide, Foster sent Peter Barnes with hands inside Clark's pasture to dig post holes along the line he claimed up to, with the purpose of removing the line of fence to that line and rebuilding it there. Sims saw the men in the pasture and ordered them out and pulled up the posts. This was reported to Mr. Foster. Foster was killed on Tuesday. On Monday Sims met two of Barnes' hands going down towards Foster's, from Victoria. When asked their business they replied that they were going down to build the fence for Foster. Sims told them they could not build it, and that he would meet them there.

Sims was in the habit of wearing his pistol when on the ranch. Tuesday morning early, Laurence Price, Richmond Hubbard and Elijah Barnes, three hired hands of Peter Barnes, drove a wagon over to the fence. There they were met by Sims, who asked them what they were there for, and they replied that they were waiting for Peter Barnes and Mr. Foster to start to work. Soon Peter Barnes and Foster came up. Foster was armed with a double-barreled shotgun. He came to the fence post where Sims was sitting on his horse, and after greeting had passed between them, he asked the men why they were not at work. They replied that they were waiting for him to come to start them. He then told Peter Barnes to take down the fence; Barnes refused to do so. Sims told him not to touch the fence; Barnes said that if Mr. Foster would take it down he would go over. Foster then took the pincers to pull the staples, and Sims told him that he had been instructed by Mr. Clark not to let the fence be taken down or removed, and further, that if he, Foster, was not an old man, that he would show him that he could not take the fence down. According to the witnesses for the State, Foster then said, "Oh, pshaw, Sims, you wouldn't fight a fly." According to the same witnesses, Foster pulled the to▮▮▮▮▮▮nd was in the act of

pulling the second staple, and in a stooping position, with his hat flopped down over his eyes, and his pipe in his mouth, when Sims shot.

According to Sims' testimony, Foster took his gun from between his knees, where he had it while pulling the top staple, cocked it and poked it up in his face, when he fired his pistol.

The State's witnesses, the three colored men, Barnes, Price and Hubbard, said that Foster laid his gun down two steps away, when he went to the fence, and did not have it in his hands at all after he laid it down. The State's witnesses contradicted themselves and each other in many material points; Barnes was impeached by showing statements made by him at other times. There was but one shot fired, and Sims' horse having pulled away from him, as he dismounted when in the act of shooting, he walked to Lavaca, and gave himself up to the deputy sheriff. Sims met Williams on the edge of town, and told him that he shot Foster because Foster had tried to shoot him, and he believed that Foster did shoot. He testified that he shot Foster to save his own life. There was but one shot fired.

When the jury had been selected, the State, without reading the indictment or requiring any plea from the defendant, proceeded to introduce the testimony on behalf of the State, and continued until the State rested. The defendant then introduced his testimony and rested; then, after the introduction of a part of the rebutting testimony, the State's attorney was permitted to read the indictment, and a plea of not guilty was entered for the defendant, he having, under advice of his counsel, refused to plead. The State's attorney did not, after the indictment had been read and the plea entered, offer to introduce again, the evidence that had been heard by the jury before the indictment was read, nor was it ever reintroduced.

The dying declarations of the deceased, Foster, were proven for the State by Dr. C. F. Scott and John Clark. Before their testimony was admitted the jury were retired, and testimony heard to determine its admissibility.

Dr. Scott then stated, "That he reached Foster's house at about 9 or 10 o'clock a. m., and found Foster in the wagon; had him moved into the house; examined his wound, pronounced it fatal, which statement was heard by Foster's daughter who embraced Foster, and began to weep, and Foster stated to her, 'Do not weep; all is well.' Foster died at about 1 o'clock in the afternoon. After I told Foster that his wound was fatal, he made this statement: 'Sims ought not to have shot me,' and afterwards he stated 'that he did not think that Sims was going to shoot.' When I told Foster the wound was fatal, he was then in a dying condition, and seemed to realize his condition. He did not express any hope of recovery or any expectation of death. He was sane; his mind appeared to be clear, and the statements made by him were not made in reply to any questions propounded to him, or in reply to any questions, but were all made vo          After I had examined deceased and his wound, he being th          ress, so as to support him in a sitting

position, the chair was placed under the mattress, after I had told him the wound was fatal. When I made my examination, I found that the lower half of his body was paralyzed."

John Clark testified that, "After Dr. Scott had examined the wound, and the chair was placed under the mattress to support him, I was about Foster's head and attending him. There were others in the room, and some one said something about Foster having had his gun. He raised up, and opening his eyes, looked at me, and said: 'Yes, I had my gun with me, but I had laid it down.'"

The defendant objected to this evidence, because it did not lay a sufficient predicate for the introduction of the dying declarations of deceased. Because there was nothing in it to show the state of mind of the deceased or to indicate that he had no hope of recovery, and because the opinion of the physician did not supply such proof, which objection was overruled by the court on the ground that sufficient predicate had been laid; that the jury was then recalled, and the dying declarations were proven before them, as made, without allowing the jury to hear the evidence of the predicate as laid, as the same had been testified to before the court, the court holding that part of the testimony was inadmissible to go to the jury; and to this ruling and action of the court the defendant objected. Because the predicate laid was not sufficient to admit the declarations, and because the defendant had the right to have the jury pass upon the evidence upon which the declarations were admitted, as well as upon the declarations themselves. All of which the court excluded and overruled, and to which exception was duly reserved.

Exceptions were reserved to the court's allowing the State to read, as part of its rebutting evidence, excerpts from the testimony of Peter Barnes—Peter Barnes' depositions taken at the inquest and examining trials in this case. It was admitted by the court in support of his testimony given as a witness on this trial, which testimony defendant had attempted to impeach by showing contradictory statements made to other parties.

*A. B. & W. M. Peticolas*, for appellant.—1. It was error for the court to allow excerpts from the depositions of Barnes to be read in support of his testimony on the stand. It was, in effect, allowing the witness to corroborate his testimony by himself. The rule allowing an impeached witness to be corroborated, by statements made on other occasions, refers to occasions out of court, and, not in connection with any legal proceedings, and at a time when he is not under the sanction of an oath. Williams v. State, 24 Tex. Crim. App., 637; 9 Tex. Crim. App., 98.

2. The court erred in admitting the dying declarations of Louis Foster.

It must satisfactorialy appear in some way, that the declaration was made under a sense of impending death, (2) that it was voluntarily made, (3) that it was not made in answer to questions, or suggestions of

a nature calculated to elicit the statement or to draw from the witness,. the information given, (4) that the witness was, when the statement was. made, of sound mind.    Benavides v. State, 31 Tex. Crim. Rep., 173; Ledbetter v. State, 23 Tex. Crim. App., 256; Hunnicut v. State, 18 Tex. Crim. App., 510; White v. State, 30 Tex. Crim. App., 654; 20 Tex. Crim. App., 638; Miller v. State, 27 Tex. Crim. App., 80; Fulcher v. State, 28 Tex. Crim. App., 467.

Foster's opinion, "Sims ought not to have shot me," was inadmissible. 9 Tex. Crim. App., 629; 5 Tex. Crim. App., 141; Collins v. Commonwealth, 12 Bush (Ky.), 271.

The court erred in refusing to allow the testimony upon which the State relied to establish the predicate for the admission of dying declarations to be heard by the jury.    Defendant had the right to have his. whole case upon the facts passed upon by the jury under appropriate charges, and by refusing to allow the jury to pass upon the question as. to whether Foster, at the time he made his alleged dying declarations,  · made them with a belief that he could not recover, defendant was deprived of a right secured him by the constitution and laws of the land.

The court erred in permitting the District Attorney to read the indictment to the jury and the record from Calhoun County showing that the plea of not guilty had been entered in that court for the defendant, and in permitting him thereafter to introduce a part of his rebutting testimony without re-introduction or offering to re-introduce the testimony which had already been heard by the jury before any issue between the State and the defendant had been made up by indictment and plea.    When the most of the testimony was heard by the jury there was no issue before them, raised according to law, between the State and the defendant.    The crime for which he was being tried, as charged by the State, was, up to the time when the indictment was read, not known to the jury.    The reading of the indictment to the jury before the introduction of the evidence as a mandatory requirement of law, and the fact that at a previous term of court in Calhoun County, the indictment had been read to. Sims, and he had been required to plead, and failing to plead, a plea had been entered for him, did not dispense with the necessity of reading the indictment to the jury before the evidence was introduced.    Holt v. State, 9 Tex. Crim. App., 571; Cole v. State, 11 Tex. Crim. App., 72; Barbee v. State, 32 Tex. Crim. Rep., 171.

The court erred in refusing the charge asked by the defendant, in which the jury were charged not to consider the evidence they had heard before the indictment was read to them in determining the guilt of the defendant in this case.    This charge was a correct statement of the law, and was the legal result or consequence of the failure to read the indictment at the proper time, and the failure of the State to re-introduce, or offer to re-introduce the testimony.

The verdict was contrary to the charge of the court, and the evidence in this, that the evidence showed that the homicide took place in defense of property, when an attack was being made upon it by the deceased,

and in accordance with the charge given, the verdict, if one of guilty at all, should have been for manslaughter and not murder. Gilcrease v. State, 33 Tex. Crim. Rep., 619; White v. Territory, 10 Pac. Rep., 37; Ledbetter v. State, 26 Tex. Crim. App., 34; Lilly v. State, 20 Tex. Crim. App., 1; Souther v. State, 18 Tex. Crim. App., 355, 6 Tex. Crim. App., 22, 10 Tex. Crim. App., 465; Bliss v. Johnson, 73 N. Y., 529; Davidson v. People, 90 Ill., 221; Ayers v. State, 60 Miss., 709; Mewly v. State, 26 Tex. Crim. App., 274-303.

*Kearby & Muse* and *Harris & Knight* also for appellant, filed an able brief in the case.

*A. B. Davidson*, District Attorney, and *Mann Trice*, Assistant Attorney-General, for the State.—(1) It is contended that the court erred in permitting the State to read the bill of indictment to the jury and entering a plea of not guilty thereto for the defendant, after the State and defendant had introduced their evidence in chief. In support of this proposition, appellant relies on Arts. 600 and 603, Code Crim. Proc. These articles have been held to be merely directory, and not mandatory. McGrew v. State, 31 Tex. Crim. Rep., 336.

The record discloses that appellant had been arraigned, and a plea entered for him in Calhoun County, from which county the venue was changed. This was all that was necessary. See, Bohannon v. State, 14 Tex. Crim. App., 271.

The defendant in a felony case can waive everything save and except his right of trial by a jury. In this case each juror, when being examined upon his voir dire, was apprised of the nature and character of the offense for which the defendant was charged, and when the panel was completed, they were sworn a true verdict to render therein on the issues joined between the State and the defendant. While it is a usual practice that after the empaneling of the jury, the indictment should be read, yet if the defendant sits quietly by, without objection, and the testimony is introduced, he would be deemed to have waived the formality of reading the indictment. Aside from this consideration, it is respectfully submitted that the record discloses the introduction of sufficient evidence after the reading of the indictment upon which to predicate the judgment in this case.

The dying declaration of the deceased was introduced subsequent to the reading of the indictment, and this, upon its face, is sufficient to predicate the judgment in this case.

2. When we look to the dying declaration, there can be no question but what the proper predicate for its introduction was laid. The deceased was shot in the morning, and died about 1 o'clock p. m., the same day. In the course of an hour after he was shot, a physician was called and pronounced his wounds mortal. No hope of recovery was expressed or even intimated by the deceased at the time the statements in question were made. Appellant however, contends that the expressions in the

dying declarations, (1), "defendant ought not to have shot me," and (2), "I did not think Sims was going to shoot me," were but the opinion of the deceased, and should therefore be excluded. This when considered in connection with the expression, "Yes, I had my gun with me, but I had laid it down," clearly brings the case within the rule that this was but a shorthand rendition of the facts.

The testimony of all the eye-witnesses to the homicide shows that the deceased was attempting to erect a fence on land that appellant claimed for H. C. Clark; that he denied his right to erect the fence in the manner sought by the deceased; that the deceased carried a shotgun with him to the place where he was at work, but at the time of the killing the gun was laying some eighteen feet away from the deceased, and the deceased was making no demonstration whatever, showing any intention on his part to inflict death or serious bodily injury upon the defendant. But, on the contrary, when the deceased was shot, he had his head down, was not looking at the defendant, and was trying to remove a staple from one of the posts, and the defendant, sitting on his horse, shot him from above, at a time when the deceased was not even looking toward him. Therefore the expressions "That defendant ought not to have shot me," and "I did not think Sims was going to shoot me," must be viewed and construed in the light of the facts attending the homicide, and especially should it be construed in reference to the other expression, "Yes, I had my gun with me, but I had laid it down." Moreover, the bill of exceptions shows that appellant did not object to the expressions as being the opinions of the deceased, but the only objection made was that no sufficient predicate had been laid for the introduction of the dying declaration. If, however, the court should conclude that the expressions complained of should have been excluded, still there is abundant proof, independent of these expressions, upon which to predicate the judgment in this case.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at five years in the penitentiary, and he prosecutes this appeal. Appellant's first bill of exceptions relates to the action of the court in changing the venue. It appears that the indictment in this case was presented in Calhoun County, and that a motion was made for a change of venue by the District Attorney. Appellant claims that the court erred in changing the venue when it did, because at the time no special venire had been summoned in the case, and said case could not be legally called up, the criminal docket not being on call at that time. He alleges that the indictment in this case was presented on the 13th of November, 1894; and that, on the 14th day of November, application for writ of habeas corpus was made, and the hearing of the same was continued until the 16th of November, at 9 o'clock; and that on the 17th of November, at night, after the action of the court on the habeas corpus proceedings, the court granted the motion of the State, and changed the venue, and appellant alleges that he did not have rea-

sonable time within which to examine the indictment and the other proceedings in the case, so as to prepare and have acted on such exceptions or demurrers to the indictment, as he might desire to present in the case.   The grounds of the motion for a change of venue, and on which the venue was changed, as stated, are because in the County of Calhoun, where the offense of which the defendant is charged was committed, on account of existing combinations and influences in favor of the accused, a trial alike fair and impartial to the State and to the accused could not be safely and speedily had in said county, and because the facts and the evidence in connection with the killing were widely known and had been thoroughly discussed among the citizens and jurors of Calhoun County, and it would be impossible to procure a jury in said Calhoun County, with any reasonable effort, to try said case; that the relations of the deceased and of the defendant were so numerous that, on account of such relationship, it would be improbable that a jury could be procured to try the said case.   As a reason for the change of venue, it is further stated that in the County of Calhoun, where the offense was committed, only one week's term of court was authorized by law.   The ·contention of the appellant is not that the grounds do not exist for the change of venue, but because of the irregularity or informality of the proceedings; and he insists that, before a change of venue could be made in the case, it was necessary to summon a special venire.   Art. 613, et seq., Code Crim. Proc., 1895, regulate the method of changing the venue in criminal cases.   It is contended that Article 617 requires that, before a change of venue can be heard and determined, all motions to set aside the indictment, and all special pleas and exceptions which are to be determined by the judge, and which have been filed, shall be disposed of by the court, and, if overruled, a plea of "not guilty" entered.   It is ·contended that this article, properly construed, means that the jury should be present and ready to try the case, before the plea of not guilty could be entered.   In a capital case, as this was, the statute provides for the arraignment of the defendant, and that the arraignment takes place for the purpose of reading to the defendant the indictment against him, and hearing his plea thereto, and that no arraignment shall take place until the expiration of at least two entire days after the day on which a copy of the indictment was served on the defendant, unless the right to such copy or to such delay be waived, or unless the defendant is on bail.   See, Code Crim. Proc., 1895, Art. 544, et seq.   These articles do not seem to require that, before a defendant can be arraigned in a capital case, it is necessary to have the jury present.   It does require that he shall not be arraigned until the expiration of at least two entire days after the day on which he has been served with a copy of the indictment, but in this case no claim of this character is presented.   We take it that he was properly served with a copy of the indictment two entire days before his arraignment.   The fact that a party charged with a capital felony cannot be arraigned until the expiration of two entire days after the service of a copy of the indictment on him would appear to be, among

other things, for the purpose of giving him an opportunity to present all necessary exceptions and demurrers to said indictment; and it has been held by this court that he cannot be deprived of said two days. See; Lockwood v. State, 32 Tex. Crim. Rep., 137; Reed v. State, 31 Tex. Crim. Rep., 35. It is not shown by the bill of exceptions that any motions, demurrers, or exceptions were presented to the indictment, nor was it made known to the court that it was desired to present any; and, in our opinion, the court did not err in overruling appellant's objections to the change of venue under the circumstances of this case. Where a change of venue is contemplated, it would appear to be an idle ceremony to wait until the special venire has been drawn and summoned; and, besides, this would be a procedure that would entail a useless expense and trouble. The statute authorizes a change of venue to be heard and determined before either party has announced ready for trial, but requires all motions, exceptions, special pleas, etc., to be determined by the judge—that is, such as have been filed—and then requires the plea of not guilty to be entered, which apprehends that the arraignment takes place; and, as this arraignment may take place before the parties have announced ready for trial, it follows that the attendance of a jury is not required under such circumstances. Appellant complains that the court erred in allowing the State to read, as a part of its rebutting evidence, excerpts from the testimony of Peter Barnes, taken by deposition upon the inquest trial, and upon the examining trial in this case. In our opinion this testimony was admissible. As we understand it, it was shown by defendant that Peter Barnes had made statements with reference to how the killing occurred, in conflict with the testimony delivered by him on the stand at the trial; and it was competent to show that he had made the same statements or statements similar in substance to those made by him at the trial shortly after the occurrence. In our opinion, it makes no difference whether these statements were made under oath in the previous examinations of the witness, or to persons on the outside. The rule in this respect is the same. Appellant urges that the court erred in admitting, over his objections, the dying declarations of Louis Foster. The grounds of his objections are that it does not appear that the deceased was at the time conscious of approaching death, and that his declarations were made in response to questions calculated to elicit his answers, and that the statements of the deceased were not of any fact, but merely opinions or conclusions. Unquestionably, it must appear, before declarations of a deceased person are admissible in evidence, that he was conscious of approaching death. According to Mr. Starkie, "the principle which this exception stands upon is clear and obvious. It is presumed that a person who knows that his dissolution is fast approaching, that he stands on the verge of eternity, and that he is to be called to an immediate account for all that he has done amiss, before a Judge from whom no secrets are hid, will feel as strong a motive to declare the truth, and to abstain from deception, as any person who acts under the obligation of an oath."

1 Starkie, Ev., 32. And Shakespeare seems to have entertained the same view when he puts the sentiment into the mouth of the wounded Melun, who, finding himself disbelieved while announcing the intended treachery of King Louis, exclaims:

> "Have I not hideous death within my view,
> Retaining but a quantity of life;
> Which bleeds away, even as a form of wax
> Resolveth from his figure 'gainst the fire?
> What in the world should make me now deceive,
> Since I must lose the use of all deceit?
> Why should I then be false; since it is true,
> That I must die here, and live hence by truth?"
>
> —King John, Act V., Scene 4.

And all of the authorities teach that it must be shown in some way that, at the time declarations were made, the declarant no longer entertained any hope of life. This condition of the mind must always satisfactorily appear from the evidence in the case. In the case before us, the deceased was shot at 8 or 9 o'clock in the morning, and lived until 1 or 2 that evening, and was suffering greatly during that time, and at no time did he express any hope of recovery. Shortly before the declarations were made, the physician informed him that there was no chance for him to recover. His daughter, who was present, threw her arms around her father, and began crying. He remarked to her: "All is well." We gather from his condition, what was said to him by the physician, and his response to his child, the fact that, from the time he was shot until his death, there was no evidence or indication on his part of any hope of life, establishing that he was conscious of approaching death, and entertained no hope of recovery. So far as any questions which may have been asked to elicit statements or declarations of the declarant, we think there is nothing in the contention of the appellant. The statements elicited from him were that "Sims ought not to have shot me," and "I didn't think that Sims was going to shoot." If this witness (the declarant) had been on the stand, we believe he would have been permitted to make these statements in evidence. While they do not appear in one sense to be a statement of any fact, but rather in the nature of a shorthand rendering of the facts, it was an issue in the case as to whether the deceased was doing any act or making any demonstration towards the defendant, or that deceased could have anticipated that the defendant would have shot him; and, in our opinion, the statement of the witness as a dying declaration was admissible in testimony. Another objection insisted on by the appellant in this connection is that the jury were not permitted to hear the testimony as to the predicate laid. While the predicate is always primarily a question for the court, still it is the better practice to have the jury hear all of the testimony in this connection. Even in cases where no issue is made as to the admissibility of the dying declarations, the jury should be placed in possession of the surroundings or

"settings" of the declaration, so they may be fully advised of the cir-
cumstances under which it was made.

It appears that on the trial of this case, by some oversight, as we take
it, after the empanelment of the jury, the indictment was not read to
them, and no formal plea was made to the indictment by the defendant.
Subsequently, after the State had elicited its testimony in chief, and the
defendant had introduced his testimony, and rested, and before the
State began to put on its rebutting testimony, the omission was discov-
ered, and the indictment then read to the jury; and, the defendant de-
clining to plead, a plea of not guilty was entered for him. The wit-
nesses who had previously been placed upon the stand were not reintro-
duced, nor was there any formal waiver of such reintroduction on the
part of the appellant, and appellant assigns this action of the court as
error. The record in this case further discloses the fact, which has al-
ready been stated, that the venue in this case was changed from Calhoun
to Victoria County, and that, before the change of venue was had, the
defendant was arraigned, and on his arraignment he refused to plead to
said indictment, which was read to him, and a plea of "not guilty" was
ordered to be entered by the court, which was accordingly done; and
such arraignment and plea constitute a part of the record of this case,
and will be considered by us in connection with this question. As
stated before, our statute provides for and requires an arraignment of a
defendant in every capital felony, which arraignment requires the in-
dictment to be read to the prisoner, and that he enter his formal
plea thereto. This constitutes the issue joined between the State
and the defendant, and is made a matter of record, and, before a
change of venue, it is imperatively required that this arraignment
take place, and, as we have seen, it was done in this case. Mr. Bishop
says: "If the prisoner has been arraigned,·and has pleaded to the indict-
ment before the venue is changed, there is no need of a second arraign-
ment and plea in the second county." See, 1 Bishop's Crim. Proc., § 74,
citing authorities, as follows: Vance v. Com., 2 Va. Cas., 162; Price
v. State, 8 Gill, 295; Davis v. State, 39 Md., 355. We have examined
said authorities, and they each support the text. We also refer to Bo-
hannon v. State, 14 Tex. Crim. App., 271, in which the question is inci-
dentally involved. Mr. Bishop further says: "Yet, if in the second county
he is arraigned and pleads again, this cannot be assigned for error. It
has been said to be a safe and judicious practice to require the plea of
not guilty to be given in before the change is awarded." And it has
been held by our court that it is no error to rearraign a defendant. See,
Shaw v. State, 32 Tex. Crim. Rep., 169. It is contended, however,
that because Art. 697, Code Crim. Proc., 1895, which states the method
of the trial before a jury, requires the indictment or information to be
read to the jury by the District or County Attorney, and to the reading
of said indictment the defendant shall plead, it is in every case manda-
tory and imperative. We construe this statute as applicable to crimi-
nal trials in general, and, of course, in every criminal trial it is abso-

lutely necessary that the plea shall be entered in the case; that is, that
the issue be joined between the State and the defendant.    But, in a
case where this plea has been entered and the issue joined, can we con-
sider that the last mentioned article is mandatory to the extent that,
where this has already been done in a given case, it must be done over
again?    Construing the statutes regulating the arraignment in capital
cases (see, Article 544, et seq., including Art. 522, Code Crim. Proc.,
1895) and Article 697 in pari materia, it occurs to us that said statute is
only mandatory to the extent that in every criminal case the plea of not
guilty, where that is relied upon, must be made.    Where no arraign-
ment has previously taken place in a capital case, and in an ordinary
case where the party is brought to trial, the indictment is then read,
and the plea of the defendant made and entered; but in a capital
case, where the arraignment has already transpired, and the plea has
been made, it would seem to be sufficient merely to state these matters
to the jury, as involving the issue joined in the case.    Of course, it
would be the better practice in all cases where the party has been pre-
viously arraigned that the indictment be read to the jury; and, while no
arraignment takes place, yet that it be stated to the jury that the defend-
ant had previously been arraigned, and entered his plea of not guilty.
However, in this case the issue was already joined between the par-
ties, was a matter of record, and was a part of the case; and, in the
presentation of the case, the evidence was all addressed to this issue,
and the jury did not misunderstand it; and, entertaining this view, we
hold, that, under the circumstances of this case, it was not necessary to
again introduce the witnesses after the reading of the indictment, and
have them reiterate their testimony.    The arraignment having already
taken place, and the defendant's plea of "Not guilty" having been en-
tered thereto, this was a part of the record of the case, and a matter of
which the court was bound to take notice, and, when the trial began be-
fore the jury, the issue was already joined between the State and the
defendant.

    The facts of this case show that the homicide occurred in regard to a
dispute as to some 200 or 300 acres of land.    Said land was situated in
Calhoun County, Texas, and was in the pasture of one H. C. Clark, who
resided at Dallas, Texas.    The defendant, J. R. Sims, was his manager
on his ranch in Calhoun County.    It appears that the pasture of said
Clark and of the deceased, Foster, joined, being separated by a line of
fencing between the two; said fence line having been placed there by
Clark, or those from whom he purchased, some years before the homi-
cide.    The deceased claimed that the fence was not on the correct line,
and that there were some 200 or 300 acres of land belonging to him in
Clark's pasture.    This question as to boundaries seems to have arisen in
the spring of the year 1894, and the homicide occurred on the 2nd of
October of that year.    The deceased claimed the land, and insisted on
moving the fence on the true line, as claimed by him.    This Clark de-
clined to agree to, but it seems, however, that at one time he was will-

ing to surrender the 300 acres on that side of the pasture, provided the
deceased would give him fifty acres adjoining his pasture at another
place, so that he could straighten his line of fencing.   The deceased re-
fused to agree to this.   The deceased, on several occasions, urged the
removal of the fence, and said, a month or two before the homicide,
that he was going to move it at all hazards.   He was told that, if it was
his land, he ought to sue for it, but he insisted that it was his, and he
would move the fence and take his land anyhow.   Clark, shortly before
the homicide, wrote the defendant, his manager, a letter, dated from
Dallas, in which he told him substantially not to permit Foster to move
the fence or get possession of the land, and directed him "to hold the
same in a mild but as firm a manner as possible."  A few days before the
homicide, the deceased sent some hands over into the pasture of Clark, to
dig post holes.  They dug a number, preparatory to moving the fence up on
that line.   The defendant saw them, and forbade their digging any more
holes, and required them to get out of the pasture.  On the morning of the
2nd of October, 1894, about 8 or 9 o'clock, deceased, with some three or
four hands, came to the line of fence in question, for the purpose of taking
it down, and moving it on the line in Clark's pasture, as claimed by him.
The hands preceded the deceased there in a wagon.   He came on a little
while afterwards, riding horseback, accompanied by one Peter Barnes,
and was carrying his double-barrel, breach-loading shotgun.   About the
time he arrived, the defendant also came up to the line of fence, and
they spoke to each other.   As to the facts immediately attending the
homicide, the State's witnesses, some three or four in number, give sub-
stantially the same account, while the defendant alone, in his testimony,
gives a different account of the matter.   We quote from the testimony
of Peter Barnes, and the account given by the other State's witnesses
substantially agrees with his statement:   "Directly after the deceased
rode up, he said to the hands:   'Why ain't you all at work?'  They re-
plied:   'We are waiting for you and Peter Barnes.'   Deceased said:
'All right, then; we will go to work.   Get down, Pete, and pull down
the fence.'  Peter replied:   'I can't cross that fence.   The question is
to be decided between you and Mr. Sims.'   Foster said:   'You are hired
to me, and in my possession, and I give you permission to tear down
the fence.'   Barnes replied that he didn't want to get into any trouble,
and he said to Sims:   'You hear what Foster says about my tearing
down the fence.'   Sims said:   'Don't you touch that fence.'   Barnes
replied that he would not touch it.   At that Foster said to Sims:   'I
want no trouble.   I didn't come out here for any.   You have had pos-
session of my land long enough, and I want to move the fence, and
build it on my line.'   Sims said:  'Foster, you can't cross that fence.
If I don't do what I am instructed to do, some one else will get my
place, and I am a poor man, and have to make a living, and can't let
you move this fence.'   Foster said:   'Will you get into trouble for an-
other man?   If you want to keep me from building my fence, you can
go to the courts, and stop me, and I can't build my fence; otherwise, I

will build.'   Sims said:   'Go ahead, and build it.   I don't care nothing
about it.   As soon as you build it, I will cut it down.'   Foster then
walked up to a fence post, and Sims looked at him right hard, and said:
'Mr. Foster, if you was not so old a man, I would show you what I
would do.'   Foster said:   'Oh, pshaw!   Mr. Sims, you wouldn't fight a
fly.'   Sims, who was close by the fence on his horse, turned around, and
put his hand on the post that Foster was at, and on Foster's hand.
Foster was pulling the first staple.   When he was pulling the second
staple, and was in a stooping posture, the wind blew his hat over his
face, and, just about this time, Sims drew his pistol, threw himself
back, and shot him, and Foster fell.   That he (witness) immediately
looked, and Sims was off of his horse, but how he got off he didn't know.
His horse ran for some distance, and Sims pursued him, failed to catch
him, then started back towards them, stopped before he got to them,
then turned, and that is the last he saw of him that day.   That he turned
his attention to Foster, who said, while he was lying there on the ground,
'I didn't think Sims would shoot me.'   He then states that they got the
deceased into the wagon, and carried him on home."   The defendant's
account of the homicide is as follows:   "That he had told the hands a
few days before, when he found them digging the post holes, to get out
of the pasture; that he wouldn't allow them in the pasture to move the
fence.   That he was down near the fence line early on the morning of
the 2nd of October, about 8 o'clock.   That he saw a wagon drive up
with some hands in it, in Foster's pasture, and they drove to within fifty
yards of the fence, and stopped.   He asked them what they were going
to do, and they said they had come to work on the fence.   That Peter
Barnes had gone to Mr. Foster's house to get him, and start to work.
In a short time, Foster and Peter Barnes rode up.   Foster had a shot-
gun, and said, 'Good morning, boys (talking to the darkies).'   Defend-
ant said, 'Good morning, Mr. Foster;' and then he said, 'Good morn-
ing, Sims.'   Defendant asked him what he was going to do.   He said
he was going to move the fence on the line.   Defendant told him
he was instructed by Mr. Clark not to let any one move the fence.   He
said it was not Mr. Clark's fence, and that he would do what he pleased
with it.   He then turned to Peter, and told him to pull the fence down.
The defendant told Peter not to do it.   Peter told Foster that he would
not do it.   Foster then took the pinchers, and started to the fence, and
defendant told him again not to pull the fence down.   The deceased said
it didn't matter; it was his fence, and he would do what he pleased with
it.   He had his gun in his hand—a double-barrel shotgun.   He walked
up to the fence with his gun in his hands, and with the pinchers he
caught hold of the wire, and pulled a staple out of the post.   When he
pulled the first staple, the defendant turned his horse around, and started
to catch Foster's hand, to stop him from pulling the staple.   Foster
lifted the gun up, and cocked it in the defendant's face.   Defendant then
pulled his pistol, and shot him.   Deceased at the time had the breach of
the gun between his legs.   Defendant also said to the deceased, during the

colloquy before the shooting, that he didn't want any trouble, and that he had a family to look after, and that he had to do what he was instructed to do. Deceased replied with a sneer, 'And, if Clark would tell you to steal one of my steers, you would do that.' In that connection he stated that there was trouble between him and the deceased about a steer that he had branded for Clark some time before that, and that the steer was the deceased's; that he branded it by mistake; and that he told the deceased about it himself; and that the deceased had afterwards complained to Clark about it. Defendant also stated that the deceased told him to get out an injunction, and stop him from moving the fence; and he told the deceased to bring suit; and, if he gained the land, the law would put him in possession. Witness also explained that, when the deceased drew the gun on him, he (defendant) immediately jumped off of his horse, and shot the deceased from the ground, and his horse ran off some distance, and after the shooting he tried to catch him, but failed; that he started back to where the shooting occurred, but changed his mind, and went to Port Lavaca, and surrendered. He also stated it was his impression at the time he shot that the deceased also fired, and he so stated to one Williams before he got to Port Lavaca." From this relation of the facts in the case, two theories of self-defense are presented, to-wit: (1) Self-defense against an unlawful attack then being made on the defendant by the deceased, which caused him to reasonably believe that his life was in danger, or his person in danger of serious bodily injury; and (2) an unlawful and violent attack on the property of the defendant, under Art. 677, Penal Code, 1895. The court gave both of these theories in charge to the jury; but the appellant contends that the court's charge upon the second theory was not the law of the case, but was an erroneous charge, and was calculated to impair the rights of appellant. That part of the charge of the court in this regard which is especially complained of is as follows, to-wit: "Subdiv. 6. If the defendant, Sims, represented H. C. Clark, and was rightfully in possession of the land inside of the fence inclosing H. C. Clark's pasture, and of the fence inclosing it, he had a right to use all lawful means to protect such possession and repel a trespass upon it by the deceased. Every effort in his power other than killing the trespasser must have been resorted to by the defendant before he would be justified in killing the trespasser; but if you believe from the evidence in this case that the defendant, Sims, did resort to every effort in his power except killing him before he shot (if he did shoot), and the killing took place while the deceased was in the very act of making an unlawful and violent attack upon the property of the defendant, you should acquit him." The principal ground of objection urged to the charge is that it makes the possession of the defendant depend on his "rightful possession." It will be noted that the statute (Penal Code, 1895, Art. 680, Subdiv. 2) with reference to the possession of property, and self-defense predicated thereon, uses the expression, "The possession must be legal, though the right of the property may not be in the possesser." The expressions

"rightful possession" and "legal possession" do not mean the same thing in this connection, and are not interchangeable. A possession may be strictly legal, but not a rightful possession; that is, a person may have such possession as the law would protect him in; such would be legal possession, yet it might not be a possession that was rightful; that is, founded in right; and a suit at law might demonstrate that he was a wrongful possessor, though at the same time a legal possessor. And under the peculiar circumstances of this case, when there was some question about the ulterior right to the property, as to who was, in fact, the owner, and had the right to the possession thereof as the ultimate owner, we cannot say that the charge as given was not calculated to prejudice the rights of the appellant, in that it made his possession depend upon the rightfulness thereof. Attention was called to this error of the court at the time, and a charge on this subject was presented, and the court refused to give the same. In this connection, we would call attention to another matter. The court correctly charged the jury that they "must believe, from the evidence in the case, that the defendant, Sims, resorted to every effort in his power, except killing the deceased," before he could rely on this right of self-defense, where property was involved. As far as it went, this announced a correct legal proposition; but, inasmuch as there was some testimony in the case suggesting that the defendant could have resorted to an injunction to prevent the deceased from moving the fence, the court should have eliminated this matter, and have told the jury that the defendant need not have resorted to such measures. Furthermore, we believe that the charge of the court, in regard to the defendant's right of self-defense in protecting his property, should have been framed more explicitly with reference to the particular facts in this case. There was, in this case, no question as to the possession of said land and fence. It was in the defendant, but held for his employer, Clark, and there was no question, either, that the deceased had determined to remove said fence. Under such circumstances, we think the correct principle is enunciated in Payne's case, 8 Cal., 341, reported in Horr. & T. Cas., p. 863. The learned judge said in that case: "Under the circumstances of this case, the jury had to inquire whether Stone and Vaughn manifestly intended or endeavored by violence to commit a felony, and, if so, whether the act of Payne was in necessary defense of himself or property. Stone and Vaughn knew that that property belonged to Payne, and the evidence goes clearly to show that they went with the determination to remove it to the premises of Stone, peaceably if they could, and forcibly if they must. The removal was determined upon, and their subsequent conduct depended upon contingencies. If the owner of the property resisted, they were prepared to use force to accomplish the trespass. It was not the intention or endeavor of Stone and Vaughn to commit a felony in respect of the property, for they did not intend to steal it; nor was it their intention to commit a robbery, for the felonious intent as to the property was wanting; but the felony they intended to commit was the killing of

Payne, if necessary to accomplish the removal of the posts. Payne being the owner of the property, and in possession of the same, had a right to use such force as was necessary to prevent a forcible trespass; and if, in doing so, he was compelled to kill Vaughn, he was justifiable. If Vaughn had not been armed, and had simply attempted the trespass without force of arms, and neither intended nor endeavored to commit a felony himself, then Payne would not have been justified in killing him. But when the trespasser goes with the intent and with the means to commit a felony, if necessary to accomplish the end intended, the owner of the property may repel force by force." See, Woodring v. State, 33 Tex. Crim. Rep., 26; Lilly v. State, 20 Tex. Crim. App., 1. In this case, from all that has gone before, it appears that the deceased had threatened to remove the fence at all hazards, had refused to appeal to the law, and had persisted in his purpose to take the matter in his own hands and make the removal; that he had hired hands previously, and sent them into Clark's pasture to dig holes on the line where he proposed to move said fence, and that they had been driven out by the defendant, and on the morning in question, when he came with the hands, armed with a shotgun, manifesting in unmistakable terms his determination to remove said fence. This he had no right to do, and the defendant could resist his attempt in this direction, and to that end repel force by force. He was not bound to retreat, and was only bound to take such other means as he could at that time resort to in order to prevent the removal of the fence. But he had a right to prevent this removal; and if he did resort to such other means as were then within his power, in order to prevent the deceased from removing said fence, and the deceased persisted in the endeavor, and was in the very act of making an unlawful and violent attack upon said fence, in order to remove it, and the defendant killed him while making such unlawful and violent attack, he could not be convicted. In this case a charge on this subject more clearly and fully presenting the rights of the defendant under the facts of this case should have been given to the jury. Of course, if the jury believed the testimony of the defendant as to the assault being made on him by the deceased at the time he shot him, the question of self-defense as to the protection of his person against an assault threatening death or serious bodily injury was involved, and the charge in this regard sufficiently presents this phase of the case; but the charge in this regard would have been better if the rights of the defendant with reference to the fence itself had been presented, and the jury ought to have been told that, if they believed form the evidence that the defendant was in possession of said fence, then he had a right to protect such possession, and to prevent its removal, and if he did no more than was reasonably necessary in that connection, and the deceased then made an assault upon him with a gun, which caused him to reasonably believe that his life was in danger or his person in danger of serious bodily injury from such assault, then, under such circumstances, he would have had the right to slay the deceased, and we would suggest

that on another trial of this case this matter be presented in some such manner as suggested. For the errors pointed out, the judgment is reversed, and the cause remanded.

*Reversed and Remanded.*

HURT, PRESIDING JUDGE, and DAVIDSON, JUDGE.—In reference to the necessity of reading the indictment to the jury, and stating the plea of the defendant thereto to the jury, we deem it unnecessary to express an opinion as to whether this procedure was correct or incorrect, or, in other words, whether the failure to read the indictment to the jury, and have the plea of the appellant stated to the jury, is reversible error or not, because this question will not arise upon another trial. We concur in the opinion of JUDGE HENDERSON in all other respects. We do not wish to be understood as dissenting, but merely express no opinion upon the subject.